**LAZY OIL, CO., John B. Andreassi, Thomas A. Miller Oil Co., and Wynnewood Drilling Associates, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**WITCO CORPORATION, Pennzoil Company, and Pennzoil Products Company, Defendants.**

**No. CIV.A.94–110 ERIE.**

United States District Court, W.D. Pennsylvania.

Dec. 31, 1997.

Joseph E. Altomare (Argued), Titusville, PA, for Appellants.

George A. Patterson, III, Brian A. Glasser, Bowles, Rice, McDavid, Graff & Love, PLLC, Charleston, WV, for Appellees Waco Oil & Gas Co., Interstate Drilling, Inc., Alamco, Inc., R.H. Adkins Companies, Gassearch Corporation.

Arthur M. Kaplan, Fine, Kaplan & Black, Philadelphia, PA, Howard J. Sedran(Argued), Levin, Fishbein, Sedran & Berman, Philadelphia, PA, Samuel D. Heins,Daniel E. Gustafson, Heins, Mills & Olson, P.L.C., Minneapolis, MN, Roberta D.Liebenberg, Liebenberg & White, Jenkintown, PA, for Appellee Wynnewood Drilling, Plaintiff.

Ronald S. Rolfe (Argued), Cravath, Swaine & Moore, New York, N.Y., David L.McClenahan, Kirkpatrick & Lockhart, LLP, Pittsburgh, PA, for Appellee Witco-Corp. Rufus W. Oliver, III, G. Irvin Terrell (Argued), Baker & Botts, L.L.P., Houston, TX, William M. Wycoff, Thorp, Reed & Armstrong, Pittsburgh, PA, for Appellees Pennzoil Company and Pennzoil Products Company.

## *MEMORANDUM OPINION*

McLAUGHLIN, District Judge.

Presently pending before the Court in this consolidated antitrust class action suit are several motions, including a motion by the Class to approve a proposed settlement of the lawsuit. Specifically, the Class seeks approval of the proposed settlement agreement and the proposed plan of allocation of the settlement proceeds. In addition, Class Counsel seek an award of $6.35 million in attorneys' fees and $486,165 in unreimbursed expenses. Various absent class members have objected to the proposed settlement, the proposed allocation plan, and/or Class Counsels' request for attorney fees. Certain of these objectors have further moved for the disqualification or removal of Class Counsel and the creation of a subclass consisting of independent oil producers. Objectors Lazy Oil Co., John B. Andreassi, and Thomas A. Miller Oil Co. also seek an incentive award in the event that the proposed class settlement is approved.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337. The following constitute the Court's findings of fact and conclusions of law with respect to these motions.

### *I. FINDINGS OF FACT*

**A. THE BACKGROUND FACTS**

1. Lazy Oil, Co., John B. Andreassi and Thomas A. Miller Oil Co. filed class action

complaints on April 19, 1994, April 26, 1994 and May 17, 1994, respectively. On July 7, 1994, the Court entered an order consolidating these actions and appointing as co-lead counsel for the Plaintiffs Howard Sedran, of the Philadelphia law firm Levin, Fishbein, Sedran & Berman and Samuel Heins, of the Minneapolis law firm Heins, Mills & Olson. Howard Specter of Pittsburgh, Pennsylvania was appointed as liaison counsel for the Plaintiffs. Subsequently, on October 11, 1994, Plaintiff Wynnewood Drilling Associates (hereinafter, "Wynnewood") filed its class action complaint.

2. All of the aforementioned actions were brought on behalf of identical putative classes composed of all persons (except for Defendants and their affiliates) who had directly sold "Penn Grade crude oil"[1] to one or more of the Defendants between January 1, 1981 and the dates on which the actions were commenced. Plaintiffs alleged that Defendants—Witco Corporation (hereinafter, "Witco"), Quaker State Corporation and Quaker State Refining Corporation (collectively, "Quaker State"), Pennzoil Company and Pennzoil Products Company (collectively, "Pennzoil")—conspired among themselves and with unnamed co-conspirators to fix, lower, maintain and stabilize the price they paid to direct sellers of Penn Grade crude oil in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The complaints sought damages and an injunction prohibiting Defendants from engaging in the alleged conspiracy.

3. On June 30, 1995, the Court entered an order permitting the consolidated action to proceed as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all "direct sellers of Penn Grade crude" to Defendants between January 1, 1981 and June 30, 1995. The Court designated Messrs. Sedran and Heins as Class Counsel.

4. Penn Grade crude oil produced in the Appalachian region of the eastern United States has qualities that make it especially useful in the production of engine lubrication oils. For many years, Penn Grade crude was considered one of the best crude oils for the production of motor oils and its qualities could not be produced synthetically. As time passed and new technology emerged, refiners throughout the country were able to use synthetic additives to make improved motor oils with qualities equivalent to those of Penn Grade crude oil. (Def.s' Expert Reports, Kalt and Lave.) By the late 1980s, three principal refiners of Penn Grade crude remained: Pennzoil, Quaker State and Witco. Recently, Witco has sold its refinery in Bradford, Pennsylvania and Quaker State has announced that it seeks to sell its Congo Refinery in Newell, West Virginia.

1. The term "Penn Grade crude oil" as used in this lawsuit has both broad and narrow meanings. In its broad sense, the term is used in this case to refer to all crude oil produced from the western side of the Appalachian Basin in the states of New York, Pennsylvania, Ohio and West Virginia. Class counsel have thus broadly defined Penn Grade crude to include the following Appalachian crudes:

(1) Quaker State: New York, Pennsylvania, Southwest Pennsylvania, Northern Pennsylvania, Bradford (Pennsylvania and New York), Allegheny, Middle District (Pennsylvania), Buckeye (Ohio), Zanesville (Ohio), Corning (Ohio), Eureka (West Virginia), Ohio, West Virginia and West Virginia Quaker State/ART;

(2) Pennzoil: Middle District (Pennsylvania), Middle North (Pennsylvania), Southwest District (Pennsylvania), Bradford District (Pennsylvania and New York), Eureka (West Virginia), Buckeye (Ohio), East Canton (Ohio), Zanesville (Ohio), Corning (Ohio) and Western Pennsylvania Corning (Pennsylvania); and

(3) Witco: Allegheny District (New York), Bradford District (Pennsylvania), Middle District (Pennsylvania), Southwest District (Pennsylvania), Buckeye (Ohio), Zanesville (Ohio) and Eureka (West Virginia). In its narrow sense, "Penn Grade crude oil" is the name given by Defendants to one of the three "grades" of crude oil produced in the Western Appalachian Basin (the other two "grades" being "Eureka" and "Corning").

5. In response to Plaintiffs' allegations of price fixing, Defendants denied having engaged in any conspiracy to fix prices, denied that producers had suffered any injury, and raised several affirmative defenses. Throughout this litigation, Defendants vigorously defended the case.

6. On September 27, 1995, the Court entered an order that provided for the sending of an approved form of notice ("Notice of Class Action") to potential members of the Plaintiff class and a period of forty-seven days within which they could request exclusion from the class in accordance with procedures described in the order. Over 80,000 copies of the Notice of Class Action were sent out to potential. class members on October 18, 1995. (*See* "Notice of Filing of Affidavit Regarding Mailing of Notice and Publication of Summary Notice," Doc. No. 93, at Ex. 1, Aff. Of Brad Heffler, CPA.) In addition, a summary notice was published in the *Wall Street Journal* and numerous other newspapers.

7. The names and addresses of the persons to whom notice was sent were drawn from the records of the Defendants reflecting persons to whom Defendants had made payments with respect to Penn Grade crude oil between January 1, 1981 and June 30, 1995. These persons included working interest owners and owners of royalty and overriding interests. Both the working interest and the royalty interest in a single oil well may be divided among many owners. A single individual may be assigned multiple account numbers in Defendants' payment records. This is true for several reasons. First, a single individual may own royalty, overriding royalty, or working interests in multiple oil wells, and the Defendants' records may assign a different account number to that individual

for each well. Second, oil produced from a single well may be purchased by several buyers in succession over the life of the well and each time the buyer changes, the persons with economic interests in the crude oil may be given new account numbers in the purchaser's system. Separate class notices were sent to each account number. Accordingly, the actual number of potential class members was substantially less than the number of notices mailed. While the precise number is impossible to determine, the parties' best estimate put the number of potential class members (including working interest, royalty and overriding royalty interest owners) at between 20,000 and 30,000.[2]

8. The Court previously granted final approval of a settlement with Quaker State in the amount of $4.4 million. The Quaker State settlement was entered into on or about December 20, 1995. It did not provide for any injunctive relief against Quaker State. After notice to class members and a hearing, the Court entered an order on June 13, 1996 approving the Quaker State settlement. Thus, only Pennzoil and Witco remained in the case as Defendants.

9. In mid-January 1997, an Agreement of Settlement Between Plaintiff Class and Pennzoil Company, Pennzoil Products Company and Witco Corporation (hereafter, "the Settlement Agreement" or the "Settlement") was executed by counsel for Defendants Pennzoil and Witco and by all Plaintiffs' counsel of record on behalf of the Plaintiff Class and two of the class representatives, Wynnewood and John B. Andreassi. The other two class representatives, Lazy Oil Co. and Thomas A. Miller Oil Co., had previously announced their opposition to the Settlement Agreement. Subsequently, John B. Andreassi announced that he was withdrawing his sup-

---

**2.** The Court notes that Lazy Oil Co. and various other objectors to the proposed class settlement have taken the position that the Class is comprised of approximately 60,000 individuals. For the reasons discussed above, the Court does not adopt this estimate. Nevertheless, we note that, for reasons set forth in more detail below, the discrepancy in the parties' respective estimates of class membership does not in any way alter the Court's findings and conclusions relative to the appropriateness of the proposed class settlement.

port for the Settlement Agreement. In light of the opposition of three of the four class representatives to the Settlement Agreement, Class Counsel moved to withdraw as counsel for the objecting class representatives but to continue representing Wynnewood and the Class. The Court conducted a hearing on this motion at which the three dissenting class representatives appeared and were heard. The Court thereafter granted Class Counsels' motion by order dated February 24, 1997. The three dissident class representatives (hereinafter referred to as the "Lazy Oil Objectors") later retained new counsel, Joseph E. Altomare of Titusville, Pennsylvania and Wayne Hundertmark of Seneca, Pennsylvania, to represent them in opposing the Pennzoil/Witco Settlement and in seeking other relief.

10. The Settlement Agreement with Pennzoil and Witco resulted after 2 and½ years of hard fought litigation and a protracted period of arm's-length negotiations between experienced antitrust lawyers.

11. The parties engaged in over 27 separate negotiating sessions to arrive at the Settlement. (Trans. of Hearing on Proposed Class Settlement, Vol. I at 19.) [3]

12. The Court preliminarily approved the Settlement on February 4, 1997. An approved form of notice of the Settlement was mailed to class members on February 18, 1997 and published in *The Wall Street Journal* and numerous regional newspapers. The notice program is described in Notice of Filing of Affidavits Regarding Mailing of Notice and Publication of Summary Notice, dated April 16, 1997 [Doc. No. 222].

13. As described in the class notices, the Court scheduled a final approval hearing for 1:30 p.m. on April 23, 1997. In order to hear all the evidence, including witness testimony from the objectors to the proposed Settlement Agreement, hearings were also held on April 28, 1997 and May 13, 1997. All persons who wished to object or comment upon any aspect of the Settlement were allowed to do so. During the course of the evidentiary hearing, the Court heard testimony from eleven live witnesses, including three expert witnesses. In addition, the Court has considered affidavits of seventeen persons and numerous documentary exhibits offered by the participants in the evidentiary hearing.

## B. THE PENNZOIL AND WITCO SETTLEMENT

14. The proposed settlement with Pennzoil and Witco, if approved by the Court, will resolve this litigation. Under the Settlement, Pennzoil and Witco have paid $9,700,000.00 and $4,800,000.00, respectively, into an escrow interest bearing account, for a total amount of $14.5 million. They also have paid $250,000.00 into a separate escrow account to pay for the costs of notice and settlement administration. The Settlement Agreement states that Pennzoil and Witco do not admit liability and have agreed to enter into the Settlement Agreement in order to avoid further expense, burden and distraction arising from this protracted litigation.

15. The Settlement Agreement (¶ 9) also provides that Pennzoil and Witco will agree to the entry of a consent order limiting certain communications with the Ohio Oil and Gas Association ("OOGA") [4] regarding their competitors' posted prices for Penn Grade crude. Specifically, Pennzoil and Witco have agreed to stop communications with OOGA about their competitors' posted price changes and have agreed

---

**3.** The Court held hearings on the merits of the Pennzoil/Witco Settlement Agreement, as well as the other outstanding motions, over a period of three days. Citations to the transcript from those hearings will be as follows: "Tr. Vol. I" will refer to the hearing held on April 23, 1997; "Tr. Vol. II" will refer to the hearing held on April 28, 1997; and "Tr. Vol. III" will refer to the hearing held on May 13, 1997.

**4.** The OOGA is an association of producers and refiners engaged in oil and gas production. (January 26, 1996, Dep. Tr. of Thomas Stewart at 17, 19–20.)

not to call OOGA for news about their competitors' posted price announcements, unless there is no other public source of the information.

16. Based upon purchases during the class period, the average market shares of the three refiners are approximately: Quaker State—40%, Pennzoil—40%, and Witco—20%. (Ex. A to Pl.s' Mem. in Supp. of Settlement, Doc. Nos. 216, 217.) Based upon a market share analysis of purchases from class members, Pennzoil and Witco will each pay approximately double the amount paid by Quaker State to settle this litigation.

17. The Settlement Fund, including both the Pennzoil and Witco funds and the Quaker State funds, less Court approved fees and expenses, will be distributed to members of the Class who submit claims in accordance with a plan of allocation and distribution. The Class has submitted a proposed plan of allocation, which was described in the mailed notice to class members. As we discuss in more detail, *infra*, certain members of the Class have objected to the proposed plan of allocation.

18. The Settlement provides for the dismissal with prejudice and the release of all claims of Class members that were or could have been asserted against Pennzoil and Witco in this action. If the Settlement is not approved, or if it is otherwise terminated or canceled, the settlement funds, less notice costs, will be returned to Pennzoil and Witco, and the status of the litigation prior to the execution of the Settlement Agreement will be restored.

19. The following objections to the proposed Settlement and positions regarding related matters have been filed or otherwise made known to the Court:

a. The three dissenting class representatives, Lazy Oil Co., Thomas A. Miller Oil Co. and John B. Andreassi, joined by approximately 384 class members (collectively referred to herein as the "Lazy Oil Objectors"), object to the amount of the proposed Settlement and its failure to pro-

vide for future price relief. In addition, they seek to remove or disqualify Class Counsel, to certify a subclass of Plaintiffs comprised of "independent producers," and to obtain "incentive awards" in the amount of $100,000 each for their contributions as class representatives;

b. Ten additional class members (the "New York Objectors") object to the amount of the Settlement and to Class Counsels' application for attorneys' fees;

c. Class member Richard Fry objects to the proposed Settlement and seeks payment of $76,400 for various services he claims to have rendered to Class Counsel;

d. Class Member Jack Master objects to the amount of the proposed Settlement and to its failure to include future price relief;

e. A group of West Virginia class members (the "West Virginia Objectors") oppose the proposed plan of allocating the Settlement Fund among class members, and to Class Counsels' application for attorneys' fees; and

f. An Ohio class member, Beldon & Blake Corporation, objects to Class Counsels' application for attorneys' fees.

C. THE ADEQUACY OF THE PENNZOIL AND WITCO SETTLEMENT

■ 20. The factors to be considered in evaluating a settlement under Fed. R.Civ.P. 23(e) are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the Defendants to withstand a greater settlement; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation. *See Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir.1975); *In re*

*General Motors Corp. Pick–Up Truck Fuel Tank Products Liability Litigation,* 55 F.3d 768, 785 (3d Cir.1995) (hereinafter, *"GM Trucks Litig."*); *cert. denied, General Motors v. French,* 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995).

### 1. The Complexity, Expense and Likely Duration of the Litigation

█ 21. The first factor in evaluating a settlement is the complexity, expense and likely duration of the litigation. This case involved numerous complex factual and legal issues relating to whether the alleged conspiracy took place and, if so, the damages suffered by the Class. The complex issues included, *inter alia,* the definition of the relevant markets; the effect of an oligopsony [5] on pricing behavior; the inferences to be drawn from evidence of price exchange communications by Defendants; the possible tolling of the statute of limitations because of alleged fraudulent concealment; the determination of the appropriate benchmark crude to calculate damages; and the determination of damages.

22. The complex issues relating to damages were the subject of conflicting testimony by numerous experts on both sides.

23. Given the complexity of this case, the large number of fact and expert witnesses and the voluminous documents relied on by both sides, the preparation for trial and the conduct of the trial itself would have been very time consuming and expensive. Also, absent a settlement, an enormous amount of additional time and expense would have been needed in connection with any motion under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), concerning the admissibility of certain disputed expert testimony. The Defendants had stated to the Court that they were going to move for a *Daubert* hearing.

In addition, it was likely that there would have been a new round of expert discovery arising from the opinions of Plaintiffs' rebuttal experts. Moreover, regardless of the outcome of the trial, it was highly likely that there would have been an appeal by the party that lost at trial, and such an appeal would have increased the expense and duration of the litigation.

24. During the course of this litigation, Defendants have contested virtually every element of Plaintiffs' claims concerning both liability and damages. The Settlement provides benefits to the Class years earlier than would be possible if this case proceeded to trial and subsequent appeals. Thus, the Settlement not only avoids the substantial risks and uncertainties inherent in further litigation, it also obviates the need for expensive and protracted litigation.

### 2. The Reaction of the Class to the Settlement

25. The proposed form of Notice of the Settlement was submitted to the Court for its review on or about January 21, 1997. On February 4, 1997, the Court approved the Notice and directed that it be mailed and published.

26. Notice of the proposed settlement with Pennzoil and Witco was mailed to class members from customer lists developed from the electronic customer files of Quaker State, Pennzoil and Witco. The mailed notice was sent to 75,691 potential class members on February 18, 1997. (Notice of Filing of Affidavits Regarding Mailing of Notice and Publication of Summary Notice, dated April 16, 1997 [Doc. No. 222].)

27. In addition to the mailed class notice, a summary notice describing this Settlement was published in *The Wall Street Journal* on March 7, 1997 and in more

---

**5.** An "oligopsony" is a market situation in which there are only a few purchasers of a particular product and a large number of sellers. (*See* Expert Report of Lester B. Lave [Pennzoil Ex. D] at 13.)

than 30 newspapers in the Appalachian region. (*Id.*)

28. The Settlement was supported not only by class representative Wynnewood Drilling Associates, but also by the overwhelming majority of other class members.

29. Several of the largest and most sophisticated producers of Penn Grade crude submitted affidavits in support of the Settlement. Jerry Jordan, chairman of Ohio-based CGAS Exploration, Inc. ("CGAS," formerly known as The Clinton Oil Company), submitted an affidavit in support of the Settlement. CGAS is one of the largest producers in the state of Ohio. (*See* Pennzoil Ex. G–3, Depo. of Thomas Stewart at 15, 33; Aff. of Jerry Jordan, Ex. B, "Exhibits To Mem. Of Pl. Class in Supp. Of Final Approval of Settlement" [Doc. No. 217]; Tr. Vol. III at 117.). A tabulation attached to Mr. Jordan's affidavit shows that CGAS sold approximately four million barrels of crude oil during the period covered by the alleged conspiracy. (Aff. Of Jerry Jordan.)

30. Edward G. Wallace, Jr. likewise filed an affidavit in support of the Settlement. (Aff. of Edward G. Wallace, Jr. [Doc. No. 231].) During the period January 1, 1981 to June 30, 1995, Mr. Wallace was the president of and/or owned a controlling interest in McAlester Fuel Company, U.S. Exploration Company, and Republic Mineral Corporation. Mr. Wallace estimated that these companies had dollar sales of approximately $500,000 to Defendants during the 1981–95 period. (*Id.*)

31. In addition, Charles Kirkwood, a director and vice president of Pennsylvania General Energy Corp. ("PGE") submitted an affidavit in support of the Settlement (*see* Aff. of Charles Kirkwood [Doc. No. 232]) and testified in support of it at the evidentiary hearing. (Tr., Vol. I at 22–47.) Mr. Kirkwood graduated from Harvard Law School in 1960. He testified that his decision to support the Settlement was based upon a review of expert reports, briefs and memoranda filed in this case addressing the various opinions on the range of damages, as well as the affidavit of former Third Circuit jurist Arlin Adams. (Tr., Vol. I at 43–44.) PGE is currently the largest producer of Penn Grade crude in the Commonwealth of Pennsylvania. During the period 1990 through 1995, PGE sold approximately one million barrels of Penn Grade crude to the Defendants. *Id.* at 23.

32. Together, CGAS, Edward G. Wallace, Jr., and PGE account for approximately 2–3% of all sales of Penn Grade crude to the Defendants.

33. Two West Virginia crude oil producers appeared at the hearing and presented testimony on behalf of the West Virginia Objectors. Barry Lay, Vice President of Engineering for the Waco Oil and Gas Company, testified that his company had sold the Defendants in excess of half a million barrels of oil between 1990 and 1994. (Tr. Vol II, 164–65.) Denny Harton, another witness for the West Virginia Objectors, is President and CEO of GasSearch Corporation, as well as a member of the Board of Directors of the Independent Oil and Gas Association of West Virginia ("IOGA")—a trade association representing over 300 West Virginia crude oil producers. (Tr. Vol II, 178–180; 189.) These witnesses (and their counsel) stated their opposition to the proposed allocation formula and to Class Counsels' petition for attorneys' fees, but did not oppose the Settlement itself. (Tr. Vol II, 159–60, 167–68; 180, 184, 188–89.)

34. Approximately 80% of the Penn Grade crude produced during the class period came from Ohio. (*See* Ex. "A," Exhibits to Mem. of Pl. Class in Supp. of Settlement With Def.s Pennzoil Co. Pennzoil Products Co. and Witco Corp., dated April 14, 1997 ("Plf.s' Ex.s to Settlement Mem.")).

35. Very few objections from Ohio producers have been submitted and those Ohio producers who *have* objected account for a minuscule percentage of sales of Penn Grade crude to the Defendants. *See*

Affidavits of Edward Radetich, Susan Hamric and Patrick Shannon. Only one producer with operations in Ohio, accounting for only about 3000 barrels of crude during the relevant period, is included in either group of objectors. (Pennzoil Ex. B at 5.) The Court accords considerable weight to the absence of significant Ohio opposition to the Settlement.

36. There are two primary groups who oppose the Settlement itself. The first group, previously referred to as the "Lazy Oil Objectors," consists of three dissident class representatives (Lazy Oil Co., John B. Andreassi, and Thomas A. Miller Oil Co.) and approximately 384 individuals[6] who have filed "Affidavits of Joinder" expressing their desire to join in the dissident class representatives' objections. The second group consists of ten producers with operations principally in New York (the "New York Objectors"), who are represented by attorneys Loren Bly and William J. Brennan. Neither of these groups has come forward with information regarding the volumes of oil they sold to Defendants during the relevant class period. Affidavits submitted by Defendants and by Class Counsel, reflecting information derived from payment records of the Defendants, indicate that both groups of opponents in the aggregate represent no more than three percent of the Class, both in terms of numbers of class members (if the Class is estimated to include 20,000 or more persons)[7] and volume of oil sold to the Defendants from the Class during the pendency of the alleged conspiracy (estimated by Plaintiffs' experts to be upwards of 92 million barrels). *See* Affidavits of Edward Sincavage, Sue Hamric and Patrick Shannon.

37. In addition, individual objections have been submitted by Messrs. Richard Fry and Jack Master.

#### a. *The Lazy Oil Objectors*

38. Lazy Oil Co., a class representative, has been a very small producer of Penn Grade crude. Bennie Landers, a principal of Lazy Oil, testified that during the period 1987 to June 1995, Lazy Oil sold no Penn Grade crude to Witco and has not sold much Penn Grade crude to Pennzoil. (Tr., Vol. II at 84–85.) For the period 1981 through 1988 and 1990 to 1995, Lazy Oil sold only 135,905.1 barrels to Quaker State. (*Id.* at 85.)

39. In total, class representative Lazy Oil Co., Bennie Landers and his related company, Kaylor Natural Gas Co., and John B. Andreassi represent 0.0135321894% of total sales to Quaker State for the period 1981 to 1988 and 1990 to 1995. (Aff. of Edward J. Sincavage, dated April 25, 1997.)

40. Approximately 384 producers submitted joinders to the objections of Lazy Oil ("Joinders"). Together, all of the Joinders and Lazy Oil, John Andreassi, and Thomas A. Miller Co. represent only 1.387% of the total sales to Quaker State during the class period (not counting the year 1989 for which data was not available). (Sincavage Aff. dated 4/25/97, at ¶ 8.)

41. Bennie Landers advised class members about his alternative damage theory of lost profits and advised them how they could register an objection to the Settlement. (Tr., Vol. II at 82.)

42. The Court has carefully considered the objections to the Settlement by class representatives Lazy Oil Co., Thomas A. Miller Oil Co., and John B. Andreassi. For reasons described in these findings, the Court finds that, while these class representatives are well-intentioned, their views about this litigation are misguided, as are their objections. The persons who have objected to the proposed Settlement

---

**6.** The number of individuals filing "Affidavits of Joinder" is referred to as an "approximation" because there appear to be some duplications among those affidavits.

**7.** Obviously, if the Class is comprised of approximately 60,000 individuals, as the Lazy Oil Objectors urge, then these objectors comprise an even smaller percentage of the Class.

have not advanced valid criticisms of the Settlement. The objectors complain chiefly that the Settlement is inadequate because: (1) it fails to take account of alleged substantial "lost profits" that class members would have received if the price of Penn Grade crude had been higher than it actually was; and (2) it fails to ensure a higher price for Penn Grade crude in the future. As discussed in further detail below, the Lazy Oil Objectors' "lost profits" damage theory is speculative, contrary to market realities, and otherwise conceptually flawed. Further, the "lost profits" measure of damages would have posed serious problems to the continued maintenance of this case as a class action, since the lost profits of each individual class member are not susceptible to class-wide proof. As is also discussed in more detail below, Plaintiffs would not be entitled to a future crude oil price guarantee even if they were successful at trial.

### (i) The Lost Profits Measure of Damages

■ 43. As we note above, one of the main arguments advanced by the Lazy Oil Objectors is that Class Counsel purportedly used the wrong measure of damages. Instead of using the price differential measure of damages, the Lazy Oil Objectors contend that Class Counsel should have used the lost profits measure of damages.

44. Under the price differential measure of damages, a comparison is made of the price actually received during the alleged conspiracy period and what the price would have been in the "but for" world. [This involves comparing the allegedly conspiratorially depressed prices paid for Penn Grade crude with the prices paid for a competitive "benchmark" crude—i.e. one that was not affected by the alleged conspiracy. In this case, Plaintiffs' experts used "Illinois Basin" as the competitive "benchmark" crude.]

45. Lazy Oil objects to the damage analysis used by Plaintiffs' experts, including the experts' comparison of the values and prices of Penn Grade crude with the

"benchmark" crude. (Tr., Vol. II at 56–57.) However, the price differential method is "widely used and accepted as a valid approach" for calculating damages. (Aff. of Dr. Kevin Neels dated 4/11/97 [Doc. No. 220].)

46. Under the lost profits theory, damages are calculated as the difference between the profits that the Plaintiffs actually earned and the profits they would have earned, but for the alleged conspiracy. (Aff. of Dr. Neels.) The central premise of the Objectors' theory is that, in the "but for" non-conspiratorial world, higher oil prices would have provided additional income to independent oil producers, which in turn would have allowed them to engage in necessary remedial work on their existing wells and/or the drilling of new wells. This additional production in turn would have spawned further profits. The Lazy Oil Objectors argue that the damages analysis performed by the Class's experts is patently deficient because it fails to take into account this element of foregone profits.

47. Dr. Neels explained in his April 11, 1997 affidavit that the Lazy Oil Objectors' lost profits damages theory erroneously inflates the amount of damages sustained by oil producers and, depending on certain variables such as the cost of drilling new wells, can actually yield a *lower* estimate of damages than that produced under the price differential theory used by Plaintiffs' experts.

48. Dr. Neels pointed out other conceptual flaws in the lost profits damages theory. For example, he noted that the Lazy Oil Objectors' theory rests upon the assumption that there is an unlimited number of new wells of constant productivity that could be drilled in the Appalachian Basin, which appears to be questionable. Also, the objectors' theory presumes that the market could absorb such increased production, despite evidence that Defendants, throughout the alleged conspiracy

period, were operating at close to full capacity. (Aff. Of Dr. Neels.)

49. Dr. Neels testified that the price differential model of damages undertaken by Dr. House calculated the "vast bulk" of the Class's damages in the case and was a "substantially complete" model. (Tr. Vol. II at 229.)

50. The Court finds Dr. Neels's affidavit and testimony persuasive in this regard and therefore credits his opinion relative to the Lazy Oil Objectors' lost profits damages theory. Consequently, the Court is not persuaded by the Objectors' argument that, absent further record development concerning the lost profits element of damages, the record is too incomplete to make a meaningful assessment of the adequacy of the Settlement.

51. In addition to the foregoing problems, there are a host of individualized and predominating factual questions in the context of a class action that need to be determined in connection with a damage theory based upon the lost profits measure. Dr. Neels in his April 11, 1997 affidavit observed that a lost profits measure of damages would require individualized information concerning operating costs, exploration and drilling costs, the likely productivity of new wells brought on-line in response to the financial incentives created by higher prices, and the ability of producers to market the new production either to the Defendants or to other refiners. (Aff. Of Dr. Neels dated 4/11/97.) The witnesses who testified on behalf of the Lazy Oil Objectors confirmed the existence of these individualized factual questions.

52. For example, Victor W. Henderson, an expert appraiser of oil and gas properties, opined that it would be possible to calculate, on a class-wide basis, the estimated lost profits suffered by the Class as a result of Defendants' alleged conduct. Mr. Henderson admitted during his testimony that, in determining the value of an oil producing property, one needs to look at (among other things): the producing horizon of the particular property; its water production, which varies by well; the extent to which the property requires deep drilling; pricing histories of certain wells; production histories; operating expenses and tax burdens. (Tr., Vol. I at 79–81.) He claimed that one could arrive at estimated values for these factors (and thereby calculate an estimate of class-wide damages) by obtaining data about typical operating expenses, tax burdens, etc., for each given area of similar depth within a particular producing horizon.[8] (Id.)

53. Mr. Henderson admitted that, while there is a general relationship between the price of oil and production, if one looked to a given property, one might find a particular producer operating for some odd reason in an unreasonable fashion. (Id. at 82.)

54. Mr. Henderson further acknowledged that, even with an increase in the price of Penn Grade crude, one would not find that there would be remedial well work on each and every property or that there would be new drilling activity. (Id. at 90.) He opined that, in order for there to be additional development drilling or remedial work, there has to be a sustained price increase of six months to a year. (Id. at 92.) However, the actual length of time that a price increase would need to be

---

8. Mr. Henderson explained that a "producing horizon" or "zone" is "a zone of a given geologic age and these zones are identified and the depths might vary for a given geologic zone from county to county or certainly from state to state." (Tr., Vol. I at 79–80.) Mr. Henderson opined that there are four or five horizons or zones within the Appalachian Basin, each of which (as noted previously) varies in terms of drilling depth, either from county

to county, or at least from state to state. (Tr., Vol. I at 79–80, 94.) Thus, as the Court understands Mr. Henderson's testimony, it would be necessary to construct a hypothetical "typical" well for each area of similar drilling depth within a particular horizon. It is not clear from Mr. Henderson's testimony (and perhaps as yet undetermined by him) exactly how many "typical" wells would need to be evaluated.

sustained in order to stimulate increased production varies among producers. Moreover, while Mr. Henderson would attempt to draw general conclusions about the Appalachian Basin as a whole, he admitted that the level of price increase necessary to motivate a particular producer to drill new wells varies from producer to producer.[9] (*Id.* at 96.) Mr. Henderson also admitted that, at a dollar increase in the price of Penn Grade crude oil, he could not tell whether any particular producer would drill new wells. (*Id.*)

55. With respect to shut-in wells, the determination of whether an increase in the price of crude oil would result in the start up of a shut-in well, as opposed to the drilling of a new well, must be determined on a case-by-case basis. (*Id.* at 92–93.) The analysis of the cost to start up a shut-in well also varies well by well. (*Id.* at 93–94.) Further, whether a particular producer owns idle wells is an important factor affecting the likelihood of new drilling. Bennie Landers testified that he would put any additional resources first into idle wells, rather than new drilling, because idle wells create a cash flow problem as well as environmental problems. (Tr., Vol. II at 102.)

56. Victor Henderson conceded that many of the factors that affect new drilling—including the drilling depth, the method of completion, the availability of land space on which to drill, the presence of shut-in wells, etc., all vary among producers. (Tr., Vol. I at 95–96.)

57. In addition, to the extent that an increase in the price of Penn Grade crude oil increased production, the refiner purchasers of Penn Grade crude would most likely first look to those producers that were located closer to their refineries. (*Id.* at 99.) Therefore, under the lost profits theory, it is possible that there could be an intra-class conflict in showing lost profits among class members, as producers farther away from refineries would theoretically suffer less harm than those located closer to refineries.

58. Further, assuming that higher oil prices would lead to increased oil production, Victor Henderson was unable to distinguish new oil production by, e.g., Pennzoil from new production by class members. (Tr., Vol. I at 102.) This points up a serious flaw in the Lazy Oil Objectors' damage approach, because production by the Defendants must be eliminated from any calculation of class-wide damages. Mr. Henderson acknowledged that, after developing an estimate of the incremental production that the Appalachian Basin, as a whole, would have theoretically produced in response to higher oil prices, it would be necessary to go back and allocate the production by referring back to individual persons and entities (such as the Defendant refiners) in order to ascertain whether they in fact drilled new wells or produced new oil. (*Id.*)

59. Victor Henderson admitted that his mass appraisal approach to lost profits has never been applied or tested in the context of a class action lawsuit. (Tr., Vol. I at 71–72.) The Lazy Oil Objectors did not provide any reasonably reliable evidence to persuade the Court that, under their lost profits theory, damages suffered by the Class could be accurately determined on a class-wide basis.

60. Another witness for the Lazy Oil Objectors, Samuel T. Pees, a petroleum geologist, confirmed that there are individual variations with respect to the price level at which wells would come back into production. He agreed that Penn Grade prices had to get to $25–$30 per barrel in order to get wells back into production. (Tr., Vol. I at 123–35.)

61. Mr. Pees also acknowledged that the cost of producing a new well depends primarily on the depth of drilling, which

---

9. It should be noted that Lazy Oil never drilled a new well during the period 1981–95, despite periodic increases in the price of oil. (Tr., Vol. II at 98.)

varies widely across the Basin. (Tr., Vol. I at 115.)

62. William C. Henderson (no apparent relation to Victor Henderson) also testified for the Lazy Oil Objectors. He is a producer of crude in the Appalachian region and also has a drilling business. (Tr., Vol. II at 8.) William Henderson testified that, in order for higher oil prices to stimulate additional production, the price increase has to be sustained for at least a year or more. (*Id.* at 27.) In contrast, Victor Henderson testified that a price increase had to be sustained for six months to one year. Thus, it would appear that there is no consensus among producers as to how long a price increase must remain in effect in order to stimulate increased production.

63. William Henderson testified that his lifting cost (the cost to lift crude) was approximately $21.00 per barrel on average. He acknowledged, however, that costs are higher on some leases than on others. (Tr., Vol. II at 24.) Bennie Landers testified that his lifting cost was $17.00 per barrel. (*Id.* at 41.) Thus, it is evident that lifting costs vary on an individualized basis. An individual's lifting costs would necessarily factor into the determination as to what level price is necessary in order to induce additional oil production.

64. In summary, the Court finds that the lost profits damage theory propounded by the Lazy Oil Objectors would necessarily require numerous individualized factual inquiries and, therefore, it is doubtful that such a theory would be susceptible to proof on a class-wide basis. Dr. Neels testified that the many differences among class members in terms of their cost structures, number of wells owned, drilling costs, etc., would require highly individualized factual inquiries under a lost profits theory. (Tr., Vol. II at 239–42.) The Court is persuaded by Dr. Neels's opinion on this point.

65. In addition, other considerations lead the Court to conclude that the lost profits measure of damages is a less feasible approach than the price differential measure used by Plaintiffs' experts. The Court acknowledges Victor Henderson's opinion that lost profits could be reasonably estimated on a class-wide basis. We reiterate our finding that the individualized nature of many of the factors that would impact on such a calculation (as outlined above) render this approach dubious in a class-action context. At worst, the lost profits approach, as outlined by Victor Henderson, could lead to decertification of the Class. At best, it is an approach founded upon multiple generalized assumptions—including generalizations about the conditions of a "typical" well and how a "typical" producer in a given area would react to certain pricing fluctuations. While the Court recognizes that a certain level of generalization and imprecision inheres in any class-wide damages calculation, the Court finds that a lost profits approach would yield a substantially less precise measurement of damages than the price differential method because it would be less capable of targeting an individual class member's damages. Indeed, the Court finds that the lost profits approach in the context of this case could well be attacked as speculative. Dr. Neels testified that the highly individualized circumstances of each producer would mean that the probability of additional drilling would vary from producer to producer. Thus, Dr. Neels did not believe that one could accurately predict the level of drilling that would have occurred in the "but for" world under a mass approach to lost profits. (Tr., Vol. II at 242.) Once again, we find Dr. Neels's testimony persuasive in this regard.

66. In addition to being ill-suited for class-wide resolution and somewhat speculative in nature, the lost profits model of damages suffers from other conceptual flaws which render questionable its utility. For one, we note that there was some evidence in this record that the Defendants had been operating at or near full capacity throughout the alleged conspiracy

period. (*See* expert report of ·Dr. Kalt; *see also* Tr., Vol. II at 235–36.) Thus, there was evidence in this record that could potentially undermine a key assumption of the lost profits theory—that additional oil could have been marketable and would have been profitable. Dr. Neels testified that, if the refiners were operating at economically full rates, introduction of a significant percentage of additional oil into the market would drive prices down. (Tr., Vol. II at 238.).

67. In addition, there was testimony at the hearing that, even assuming a seven percent increase in the price of oil during the conspiracy period (the percentage by which Dr. House calculated that the Class was underpaid), Penn Grade crude prices would not have reached a sustained price level high enough to induce additional drilling. (Tr., Vol. II at 26–27; 231–35.) [10]

68. There was also evidence that other factors beside price affected the rate at which new oil wells were drilled in Pennsylvania, including the Pennsylvania Oil & Gas Act and the Tax Reform Act of 1986. (Tr., Vol. II at 28.) Thus, apart from problems with class-wide proof, the lost profits model of damages suffers from substantive conceptual problems.

69. · Finally, we find that adoption of the Lazy Oil Objectors' lost profits theory would result in tremendous expense and would unduly protract this litigation. Victor Henderson stated that, in order to develop a class-wide lost profits model of damages, he would require a team of the

experts, including a geologist and an economist. (Tr., Vol. I at 82–84.) Mr. Henderson· felt that it would ˙ take 2–3 months to develop the damages model. However, Samuel Pees testified that he would require a team of 7–8 individuals working for at least 3–6 months in order to develop a model of the geographic parameters of the Appalachian Basin. (Tr., Vol. I at 120.) The Court concludes that pursuing a lost profits model of damages, as outlined by the Lazy Oil Objectors, would require a tremendous investment of time and money without significantly enhancing the Class's chances for an increased recovery. Indeed, in light of the many problems presented by the Lazy Oil Objectors' lost profits model, we find that it was reasonable for Class Counsel to pursue a price differential theory of damages in the context of this case. [11]

70. For all of the foregoing reasons, the Court finds that the lost profits measure of damages is a less feasible approach in the context of this class action lawsuit than the price differential theory of damages employed by the Class's experts. Accordingly, the Lazy Oil Objectors' complaint that the proposed Settlement should be rejected because it fails to account for lost profit damages is not persuasive.

### (ii) The Objection Relative to Future Pricing

 71. The Lazy Oil Objectors also oppose the Settlement on the ground that it does not, in their opinion, provide

---

**10.** In their consolidated brief filed post-hearing, the Lazy Oil Objectors make much of Dr. House's statement at deposition that he believed some additional production would have resulted if posted prices during the conspiracy period had been higher by $1.50 per barrel on average. (*See* Consolidated Be. Of Lazy Oil Objectors at 11, 15; Lazy Oil Ex. 4–C at 665.) Nothing in this testimony convinces the Court that a lost profits damage model is preferable, much less required, in the context of this case. Indeed, we find the purported significance of Dr. House's remark to be somewhat overstated. Dr. House testified that, in general, he expected there would be "slightly more production" if the posted price

was higher. (Lazy Oil Ex. 4–C at 665.) Of course, Dr. House's damage analysis did· not include a lost profits measurement. Therefore, Dr. House was unable to quantify the additional production. Similarly, Dr. House did not determine at what price level new wells would be drilled. (*Id.* at 666.) ·Dr. House also testified that he did not study nor did he have an opinion on how supply would come into the market with an increase in price. (*Id.* at 667.)

**11.** The Court, of course, does not express any opinion as to the ultimate merits of the Plaintiffs' experts' theories.

enough security that the price of Penn Grade crude will be maintained at competitive levels in the future. (Tr., Vol. II at 73–74.) Bennie Landers testified that he was looking for a settlement agreement that would stabilize future prices and thereby provide economic security for Penn Grade producers in the future. (*Id.* at 74–75.)

72. In connection with the settlement negotiations with Pennzoil and Witco, Mr. Landers requested that the Settlement provide that future prices would be pegged to the NYMEX price for crude.[12] (*Id.* at 113.) This demand was communicated by Class Counsel to Pennzoil and Witco. However, it is undisputed that the Defendants were unwilling to agree to such terms as part of the Settlement. (*Id.* at 113–14.)

73. Further, Mr. Landers admitted that he was looking for an agreement with the Defendants whereby future oil prices would be stabilized at a particular price for a particular period of time. (Tr., Vol. II at 74.) Mr. Landers admitted to being advised by Mr. Sedran that such an agreement was not possible because it would be in violation of the law. (*Id.* At 75.)

.74. Mr. Landers next suggested that what he actually sought was stronger injunctive relief. He explained that he was essentially looking "to stop [the Defendants] from doing [in the future] what they were doing [in the past]." (Tr., Vol. II at 76.) This, he felt, would result in a true competitive marketplace and, by implication, higher oil prices. (*Id.*)

75. However, it is undisputed that, at the time of the settlement hearings Quaker State was in the process of selling its Congo refinery, and Witco had already sold its Bradford refinery. As Mr. Landers acknowledged, neither Witco nor Quaker State will be purchasing Penn Grade crude oil in the future. (Tr., Vol. II at 112–13.) Therefore, any future injunc-

tive relief as to these two companies would essentially be meaningless, since Pennzoil would not be in a position to conspire with either Witco or Quaker State relative to the future pricing of Penn Grade crude oil.

76. The absence of the injunctive relief sought by the Lazy Oil Objectors does not render the Settlement Agreement unfair or unreasonable.

### (iii) The Alleged Procedural Deficiencies

77. The Lazy Oil Objectors also attack the Settlement on the ground that the class members' due process rights have been compromised by the conduct of Class Counsel and by inadequacies in the class notice. They complain that they had no input into either the negotiating process or the selection of the theory of damages on which the case was to proceed. Mr. Landers claimed that the Settlement was presented to him as a *fait accompli* and, in addition, he was asked to delay his decision about the Settlement until after the Class had voted.

78. The Court finds, as a factual matter, that Mr. Landers was involved in the settlement process. As previously noted, Class Counsel demanded, on behalf of Mr. Landers, that future Penn Grade crude oil prices be pegged to the NYMEX prices. This request was rejected by the Defendants. (Tr., Vol. II at 113–14.)

79. Further, there is evidence that Mr. Sedran had contact with Mr. Landers through his personal representative, Reid Eschallier. The Court credits Mr. Sedran's testimony that, while Mr. Landers was not involved in the "back and forth" of every settlement demand and offer, Mr. Eschallier was involved in some of the settlement discussions and was apprised of the general range of settlement. (Tr., Vol. II at 152–54.)

---

12. The NYMEX ("New York Mercantile Exchange") price is a futures price that represents the price that will be paid by a pur-chaser for West Texas Intermediate crude delivered at Cushing, Oklahoma. (*See* Tr., Vol. III at 115.)

80. The Court further credits Mr. Sedran's testimony that, in the course of his contacts with Mr. Landers, Mr. Landers made settlement demands which Mr. Sedran felt were outrageous, not in the best interest of the Class, and incapable of being obtained in this litigation. (*Id.* at 154.)

81. The objectors complain that they were not given a voice in the selection of the Class's theory of damages. However, we reiterate our previous finding that, in the context of this case, the lost profits theory advanced by the Lazy Oil Objectors was a less feasible approach to damages than the price differential theory used by the Plaintiffs' experts. Accordingly, Class Counsel acted reasonably and in the best interests of the Class as a whole in adopting a price differential measurement of damages.

82. Mr. Landers complains that he was presented with the Settlement at the last minute and asked to approve it on short notice. He claims that Mr. Sedran urged him to forego objecting to the Settlement until the Class as a whole had an opportunity to vote on it. The Court credits Mr. Sedran's testimony that he did not talk Mr. Landers into agreeing to withhold his views pending a class response to the Settlement. Rather, the Court finds that Mr. Sedran initially urged Mr. Landers to think over the terms of the Settlement Agreement and try to absorb the information before arriving at a decision whether or not to support it. (Tr., Vol. II at 145.) Subsequently, when Mr. Landers voiced his opposition to the Settlement, Mr. Sedran sought Mr. Landers's view concerning the propriety of submitting the Settlement Notice to the Class in order to ascertain the Class members' views about the Settlement. (Tr., Vol. II at 145–46.) We find no evidence that Mr. Sedran engaged in misconduct in this regard. And, in any event, the class members *were* ultimately advised in the notice that some of the named class representatives did not approve of the proposed Settlement.

83. The Court further finds that, in negotiating the proposed Settlement Agreement, Class Counsel acted responsibly and in the best interests of the Class as a whole.

84. The Lazy Oil Objectors also claim that there were fatal deficiencies in the notice that was sent to Class members to inform them of the proposed Settlement, viz: it incorrectly states that only two (rather than three) of the class representatives opposed the Settlement Agreement; it fails to disclose that the previous settlement with Quaker State was a mere "icebreaker" settlement, not one intended to be a fair, adequate and reasonable compromise of the Class's claims against Quaker State; and it fails to disclose the total amount of possible recovery being compromised.

85. The Lazy Oil Objectors' claim that the Class Notice was misleading is unfounded. The Notice adequately advised class members of the terms of the Settlement; the proposed allocation formula for the settlement proceeds; the fact that certain of the class representatives opposed the Settlement; the request of Class Counsel for attorneys' fees and reimbursement of expenses; the request for incentive awards for the class representatives; the date and time of the final hearing, and the class members' right to object to the Settlement. To the extent that the Class Notice lacked any pertinent information necessary for class members to arrive at an informed decision about the Settlement, class members were invited to inspect the public file or to contact a toll-free number to obtain additional information.

86. Further, the Court finds that none of the alleged omissions or misstatements in the class notice are so material as to have likely influenced or altered the absent class members' response to the Settlement in a significant manner. While the purported notice deficiencies may have some relevance in terms of assessing the reaction of absent class members, the Court considers them to be of essentially

minor relevance in light of the many factors informing our assessment of the Settlement Agreement. In any event, none of the alleged notice deficiencies persuade the Court that the Settlement Agreement is unfair, unreasonable, or otherwise not in the best interests of the Class as a whole.

### b. *The New York Objectors*

87. A group of ten objectors (referred to hereinafter as the "New York Objectors") has opposed the Settlement. According to Defendant Pennzoil's records, the New York Objectors' sales to Pennzoil between the years 1987 to 1995 total approximately 184,987 barrels, or less than .05% of the Appalachian crude that Pennzoil purchased during that period. (Tr., Vol. III at 118.)

88. The New York Objectors, like the Lazy Oil Objectors, oppose the Settlement on the grounds that the monetary component is insufficient and the injunctive relief is not strong enough. These objectors offered no evidence at the hearing in support of these assertions, but instead essentially based their position on the proof submitted by the Lazy Oil Objectors. In addition, they oppose Class Counsels' request for an award of attorneys' fees. These issues are dealt with in more detail, *infra.*[13]

### c. *The Objections of Richard Fry, Jack Master and Others*

89. The Court has considered all other objections and is not persuaded that they warrant disapproval of this Settlement. Class member Richard Fry, a very small producer (Tr., Vol. III at 20), objects that the settlement amount is insufficient. For the reasons discussed in detail below, the Court finds the settlement amount to be adequate. Consequently, the objections by Mr. Fry are denied.

90. Mr. Fry has also requested that he be awarded $71,000 for unspecified investigative services. That request is denied. Mr. Fry has failed to demonstrate that he has done anything that warrants such a payment. Moreover, the conduct of Mr. Fry in connection with his effort to procure an affidavit from a factual witness, Timothy Weaver, is suspect. It appears that Mr. Fry is seeking payment on account on his attempt to act as a broker to have Mr. Weaver provide additional testimony in this case. (Tr., Vol. III at 23–24, 151–155.) The Court does not find that there existed any agreement between Mr. Fry and class counsel that would support Mr. Fry's request for payment.

91. Jack Master, a producer and the current President of the Pennsylvania Independent Oil Producers also objected to the Settlement. Mr. Master claims that the Settlement fails to ensure a sufficiently high price to producers for Penn Grade crude, whose quality he considers to be superior to that of competing crudes. However, as discussed in more detail below, competitors and parties cannot reach any agreement proscribing a particular price level for Penn Grade crude without running afoul of the antitrust laws.

### 3. *The Stage of the Proceedings and the Amount of Discovery Completed*

92. Another factor to consider in evaluating the proposed Settlement is the stage of the proceedings and the amount of dis-

---

**13.** The New York Objectors also argue in their memorandum [Doc. No. 201] that the notice of settlement was deficient because: (1) it does not disclose the potential damages that would be recoverable (or the statutory right to an award of attorneys' fees) if the Class should prevail at trial; (2) it fails to advise class members of their potential individual recovery under the proposed Settlement; and (3) it does not reflect the fact that three named representatives oppose the Settlement. Inasmuch as most of these alleged deficiencies mirror the complaints raised by the Lazy Oil Objectors, we need not rehash this issue. Suffice to say that the Court is not persuaded by this line of argument. We find that none of the alleged deficiencies in the notice rise to such a level as to compromise the fundamental fairness of the Settlement or require this Court's disapproval of it.

covery completed at the time of the Settlement.

93. The proposed Settlement with Pennzoil and Witco was reached on January 15, 1997, more than 2½ years after the litigation commenced. Before the Settlement was entered into, Plaintiffs had completed merits discovery and much of the expert discovery, as discussed above.

94. During the lengthy discovery process, Defendants produced almost 1.5 million pages of documents which were reviewed and analyzed by Plaintiffs' counsel. In addition, substantial quantities of information were produced in electronic form and more than 80 depositions were conducted, including depositions of Defendants' current and former employees as well as third party witnesses. Also, substantial expert discovery was completed, including preparation of numerous expert reports, rebuttal reports and the depositions of Plaintiffs' and Defendants' experts.

95. Since the Settlement was reached after the completion of extensive discovery, Plaintiffs' counsel were fully aware of the strengths and weaknesses of their case and could make an informed decision as to the fairness and reasonableness of the Settlement.

96. With discovery essentially complete, the Defendants were preparing to file dispositive motions attacking every aspect of Plaintiffs' case. These included a renewed motion for summary judgment[14] and a motion seeking to strike all of Plaintiffs' expert witnesses for failure to satisfy the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Defendants' motion to strike Plaintiffs' three rebuttal expert witnesses (on non-*Daubert* grounds) was pending at the time the Settlement Agreement was reached, but was later denied without prejudice to

re-filing. Thus, it is likely that this motion too will be reasserted by Defendants in the event the Settlement is not approved.

97. The settlement negotiations between counsel for the parties were conducted at arms'-length and were extensive. There were 27 negotiating sessions that spanned a period of 8 months, from March, 1996 to November, 1996. (Tr., Vol. I at 19.) The Settlement that resulted reflected reasonable compromises on both sides.

### 4. The Risks in Establishing Liability at Trial

98. If this case had proceeded to trial, Plaintiffs were confronted with substantial obstacles and risks in establishing liability on the part of the Defendants.

99. This was not a case where the Defendants had been convicted or pleaded guilty to criminal charges of price-fixing. Indeed, although a grand jury investigation of Defendants had been conducted, the evidence was apparently deemed insufficient to warrant the commencement of either criminal or civil proceedings against the Defendants by the government. (Tr. of 3/7/96 Pretrial Hearing [Doc. No. 129] at 15.)

100. Plaintiffs were unable to adduce any direct, "smoking gun" evidence of a conspiracy among the Defendants to fix prices. The evidence indicates that Defendants' posted prices for Penn Grade crude were usually, although not always, the same.[15] This evidence would not have sufficed to establish a violation of Section 1. Because the Penn Grade crude oil industry is an oligopsony, price coalescence can be expected, given the pressures of the market place. This is because individual buyers would know, without communicating with other buyers, that if they offered

---

14. Defendants' first motion for summary judgment was denied in July 1995 without prejudice to be refiled following a period of additional discovery.

15. In fact, there were periods of time during the life of the alleged conspiracy when Defendants' posted prices were significantly different. (Witco Ex. B [Doc. No. 227], Tabs 2, 3, and 4; Pennzoil Ex. G–1 at 342–44.)

prices that were below those offered by the others, they would not be able to buy oil, and that if they offered higher prices than the others, the others would probably match the higher price. This view was confirmed by the evidence presented at the hearing. (Lazy Oil Ex. 4C at 699; Pennzoil Ex. D at 25; Pennzoil Ex. G–1 at 329; Witco Ex. B (vol.II), Tabs 12, 13, 18, 19, 22, 25, 30, 31, 33, 35.) Thus, Plaintiffs could not rely solely on the evidence of uniform pricing to prove liability in this case.

101. At the final hearing, counsel for the Lazy Oil Objectors pointed to a November 8, 1985 Quaker State interoffice memorandum from Bud Koch to W.E. Kingsley, which counsel described as a "smoking gun." (*See* Lazy Oil Ex. 1, "Exhibits to Pl.s' Mem. in Opp. to Def.s' Mot. for Summ. Judg." at Tab L.) The memorandum describes a conversation between Mr. Koch and Robert Chiles of Pennzoil concerning Pennzoil's policy of refusing to accept crude oil containing more than a specified maximum percentage of water. However, the probative value of this memorandum at trial would have been highly dubious inasmuch as the memorandum did not constitute direct proof of a conspiracy and did not deal with any particular prices. Furthermore, Pennzoil and Quaker State frequently engaged in crude oil purchases, sale and exchange transactions between themselves. (Pennzoil Ex. E, Ex.12 at 31; Pennzoil Ex. G–2 at 226–27.) In light of this fact, communications between them as to whether they should accept crude oil with water in it hardly amounts to smoking gun evidence of a price fixing conspiracy. It would have been entirely proper for Pennzoil, as a recipient of crude oil from Quaker State, to announce its policy on maximum acceptable water levels in crude oil, in view of the fact that water-borne contaminants could cause serious damage to Pennzoil's refinery. (Pennzoil Ex. G–1 at 314–16.)

102. The Lazy Oil Objectors also rely on the deposition testimony of Mr. Lan-

ders regarding a conversation he allegedly had with Ann Jones, an employee at Quaker State with no pricing authority. (*See* Lazy Oil Ex. 1, Tab E and Pennzoil Ex. G–6 at 54–55.) Mr. Landers claimed that, on inquiring how Quaker State intended to react to Pennzoil's then recent price reduction, Ms. Jones replied, "Somebody from here will get a hold of Pennzoil to see where to leave the price." (*Id.*) Ms. Jones emphatically testified that no such conversation about Quaker State getting together with Pennzoil to discuss prices ever occurred. (*See* Pennzoil Ex. G–4 at 55, 75–78, 83–85.) It is, of course, almost impossible to predict how a jury would resolve this credibility issue. Furthermore, in light of the Defendants' many challenges to the Plaintiffs' case, as discussed *infra*, and the likelihood that resolution of the case would turn largely on expert testimony, the probative force of this alleged remark is by no means certain. Even if such a statement were made, it could be reasonably interpreted to mean only that Quaker State seemed to be following a practice of matching Pennzoil's posted price, which would have been entirely lawful in the absence of agreement between Pennzoil and Quaker State concerning future prices.

103. Since the Plaintiffs lacked direct evidence of a conspiracy, in order to prevail they would have been required to show not only consciously parallel pricing by the Defendants, but also the existence of one or more "plus" factors.

104. All of the "plus factor" evidence relied upon by Plaintiffs was circumstantial and subject to innocent explanations by the Defendants.

105. In this litigation Plaintiffs contended that the Defendant refiners controlled the prices of Penn Grade crude oil through their ownership of virtually all the refining capacity in the relevant geographic market. They asserted that the Defendants did not negotiate individually with the class members, but instead utilized a posted price system, and the posted prices were nearly identical at all relevant times.

106. The process by which Defendants decided on and announced their posted prices was examined in great detail in discovery. All of the people involved in the process denied under oath that they engaged in any collusion. [Pennzoil Ex. G–1 at 463–64; Ex. G–2 at 461–62; Witco Ex. B, Tabs 17, 19, 23, 24, 28, 33.]

107. Discovery showed that the amount of time elapsing between Defendants' announcement of price changes varied considerably, ranging from a matter of minutes to hours and even days in some cases. (Pennzoil Ex. E (Ex. 12 at 6); Pennzoil Ex. G–1 at 328–29.) Moreover, there is evidence of several occasions on which a Defendant announced a reduction in its own posted price but was later forced to rescind the price reduction, retroactively, because other Defendants did not reduce their prices. (Witco Ex. B, Tabs 19, 30, 31; Pennzoil Ex. G–1 at 328–29, 342–44.) Similarly, there is evidence of a Defendant "leapfrogging" another's price increase, announcing an even higher price and forcing the others to move to the higher price. (Pennzoil Ex. E (Ex. 12 at 5); Pennzoil Ex. G–1 at 146, 152–53; Pennzoil Ex. G–3 at 89–90; Witco Ex. B, Tab 19.) There is no evidence that any price increase was ever rescinded. (Pennzoil Ex. E (Ex. 12 at 5.)) Moreover, on occasion a Defendant would deliberately wait until late in the day to announce a price increase, thereby attempting to capture producer accounts from other Defendants by making it difficult for them to match the price increase on the same day. [Pennzoil Ex. E (Ex. 12 at 6); Pennzoil Ex. G–2 at 404–406.] This evidence is inconsistent with the claim that Defendants were engaged in a conspiracy to keep prices low.

108. There is evidence that Defendants' competition to buy oil was not limited to their posted pricing strategy. For example, Defendants offered monetary premiums, in addition to the posted price, to producers who aggregated oil in truckload quantities; they paid bonuses, in addition to the premiums, to some producers to

persuade them to sell them their oil; and they offered "price protection" arrangements to protect producers from drops in the posted price occurring between the time a producer called for his oil to be picked up and the time it was actually loaded. [Pennzoil Ex. D at 25–26; Ex. E (Ex. 12 at 8–11); Ex. G–1 at 188–89; Witco Ex. B, Tabs 13, 20, 26, 31, 32, 34, 35.]

109. Plaintiffs relied heavily on evidence of exchanges of price information through OOGA. Under this system, a Defendant would telephone OOGA with word of a change in its posted price. Defendants contend that price changes were either effective immediately, or were to be effective at 7 a.m. the following day and were announced to OOGA so late in the day that no transaction could occur at the new price on the day of announcement. OOGA would then telephone the other Defendants to advise them of the change. If one of the other Defendants decided to change its prices in response to the first change, that Defendant would telephone OOGA with word to that effect. After hearing from the others, OOGA would telephone the first Defendant to inform it of the other Defendants' price announcements.

110. Plaintiffs contend that Defendants' participation in this price reporting system enabled them to "negotiate" among themselves to arrive at agreed-upon posted prices. However, Defendants asserted that the pricing information exchanged through OOGA related to already-posted prices, not future prices, and therefore was not illegal. Defendants further contended that the frequent communications between them were innocuous and were required as a matter of business necessity by virtue of the nature of the market.

111. Moreover, there was evidence that this system of communication had been devised by OOGA, which was controlled by its producer members, long before the alleged conspiracy was alleged to have arisen and that Defendants were asked to participate in the system by the Associa-

tion. (Pennzoil Ex. G–2 at 147–48; Pennzoil Ex. G–3 at 85–87, 90–93.) Most of the oil processed in the Defendants' Appalachian refineries, as previously noted, is produced in Ohio (Witco Ex. B, Tab 29; Tr., Vol. II at 86), and a Pennzoil representative testified on deposition that Pennzoil agreed to participate in the system as an accommodation to the association representing the great majority of Pennzoil's Appalachian crude oil suppliers. (Pennzoil Ex. G–2 at 147–48.) The Executive Vice President of OOGA testified on deposition that he believed that Defendants' participation in this system benefitted the producers by insuring that an individual refiner's price increase would be known to, and matched by, the other refiners. (Pennzoil Ex. G–3 at 86–93.)

112. Defendants vigorously argued that no price-fixing conspiracy could have occurred without the involvement of Ashland Oil Company, a significant participant in the relevant crude oil market. However, Ashland was not a named Defendant in this case and Plaintiffs had not adduced any evidence that Ashland was a member in the alleged conspiracy.

113. Defendants had also relied on certain evidence to support their contention that their pricing was competitive with one another. They had argued that their crude oil competed with other types of crude oil sold by refiners from throughout the world, and therefore the price of Penn Grade crude oil was controlled not by the Defendants, but instead by the world market. Once again, such evidence demonstrates that Plaintiffs were confronted with substantial risks and uncertainties in establishing liability at trial.

114. Defendants argued that the alleged conspiracy to fix prices artificially low could not succeed unless demand for Penn Grade crude was suppressed. (Pennzoil Ex. E (Ex. 12 at 11–13); Ex. D at 38.) However, Defendants' economic experts developed evidence that Defendants ran their Appalachian refineries at economically "full" rates and, in some in-

stances, even expanded their refining capacities, during the alleged conspiracy. (*Id.*) These experts also pointed out that Defendants sold some of their refinery capacity to firms not alleged to be participants in the alleged conspiracy, thereby surrendering some control over demand for Appalachian crude oil to "non-conspirators." (Pennzoil Ex. D at 37–38.) Several of the firms that purchased refineries from the Defendants later went bankrupt, and then simply stopped buying Penn Grade crude. Defendants argued that this fact was inconsistent with the hypothesis that prices were artificially depressed. (*Id.*)

115. In light of the conflicting and ambiguous evidence, and the sharply differing opinions of the parties' experts, Plaintiffs' likelihood of prevailing at trial was far from assured. Indeed, Plaintiffs faced the risk, not only of an adverse jury verdict on liability, but also that their liability case would not survive Defendants' renewed motion for summary judgment or a motion for judgment as a matter of law at trial.

a. *Statute of Limitations*

116. Plaintiffs sought damages for the period January 1, 1981 through June 30, 1995. If the four-year statute of limitations applied to their claims, they would be barred from recovering damages for conduct occurring prior to April 19, 1990, which is four years prior to the commencement of the first of these consolidated actions.

117. In an effort to escape the application of the four-year statute of limitations, Plaintiffs pleaded that Defendants fraudulently concealed their alleged conspiracy, that Plaintiffs were unaware of the alleged conspiracy, and that Plaintiffs could not have discovered it through the exercise of reasonable diligence, until shortly before the actions were filed in 1994.

118. Plaintiffs would have a difficult time proving fraudulent concealment, and particularly active concealment by the Defendants to conceal the alleged conspiracy.

It is undisputed that Defendants conducted the price posting system, which Plaintiffs portrayed as the heart of the alleged conspiracy, openly since at least the early 1960's. The results of the conspiracy alleged by Plaintiffs—general uniform prices—have been publicly known for decades. Moreover, the fact that the Defendants' posted prices for Penn Grade crude were usually different from the published prices for allegedly "inferior" crude oil (e.g., the NYMEX futures price for West Texas Intermediate crude)—a price difference which Plaintiffs contend resulted from the alleged conspiracy—was known to producers and was always obvious from inspection of newspaper reports of the two prices. (Pennzoil Ex. G–2 at 142–44; Witco Ex. B, Tab 16 at 131–32, 154–55, 186–87; Witco Ex. B, Tab 15 at 31–32, 36–37.) Defendants point out that crude oil producers in fact often complained to Defendants about the price difference. (Witco Ex. B, Tab 15 at 31–32, 36–37; Witco Ex. B, Tab 16.)

119. In addition, the leaders of the Pennsylvania Independent Petroleum Producers ("PIP–P"), the Pennsylvania Producer's organization admitted that they suspected price fixing for years. (Pennzoil Ex. G–8 at 87–88, 115–16, 200.)

220. At his deposition, Bennie Landers testified that he felt that there was no competitiveness because the refiners all pay the same price and that had been the case as long as he had been in the oil business. (Pennzoil Ex. G–6 at 479.)

221. Objector Richard Fry stated during the hearing on class settlement that he and Bennie Landers had each suspected for years that Defendants were engaged in price fixing and collusion. (Tr., Vol. III at 6, 17.)

222. Thus, given the fact that many class members suspected price collusion long before the commencement of this action, and considering the absence of strong evidence of fraudulent concealment, it is highly unlikely that Plaintiffs would have been able to recover damages beyond the statute of limitations period.

*5. The Risks of Establishing Damages*

223. Plaintiffs claim that Defendants' conspiracy caused them damages for the period January 1, 1981 to June 30, 1995. In connection with their claim for damages, Plaintiffs submitted expert reports from two experts: Donald House, Ph.D., an economist, and Charles J. Queenan, III, an expert in refinery analysis.

224. As part of their damage analysis, Plaintiffs calculated damages under what they call a marginal crude value analysis. Marginal Crude Value is the additional profit (pre-tax) that a refiner earns in a particular period by refining the last incremental quantity of a specific type of crude oil. (Expert Report of Charles J. Queenan, III, dated November 1, 1995, hereinafter "Queenan Report".)

225. According to the expert report of Mr. Queenan, marginal crude value, measured in dollars per barrel of a crude oil input to a refinery, is defined as follows:

Marginal crude value = Marginal product revenue

— incremental refining cost

— incremental transportation cost

— crude oil purchase cost.

(Queenan Report at 1–2.)

226. A variety of different products can be made from a barrel of crude oil. The particular mix of products made from a barrel of oil is referred to as its product slate. The specific products that are produced, and the specific quantities of those products that are produced, depend both on the composition of the crude oil and the technical characteristics of the refinery in which it is refined. (*Id.* at 2.)

227. According to the Queenan Expert Report:

Within the refining industry, computation of crude values is quite common. Such computations are used for profit planning, crude oil trading and purchas-

ing, crude oil supply planning, operations planning, strategic planning and for other purposes.

Documents produced in this case by Pennzoil, Quaker State, and Witco, together with the deposition testimony of their employees, provide evidence that Defendants calculated crude values for various crude oils in the normal course of their business.

(*Id.* at 2.)

228. The Queenan Expert Report also provides:

> Among the three Defendants, the information provided by Pennzoil demonstrates that Pennzoil computed, on a monthly or more frequent basis, marginal crude values for Penn Grade, Corning and Eureka, and sometimes for other crude oils and feedstocks, refined at its Rouseville, Pennsylvania refinery. [Footnote omitted.] In its documents, the marginal crude values determined by Pennzoil are sometimes referenced synonymously as "crude incremental margins."
>
> Pennzoil routinely evaluated the marginal refinery values of Penn Grade, Corning and Eureka crude oil using a computer spread sheet model. Pennzoil described this analysis as follows in an October 1988 memorandum:
>
> > Marginal crude economics are run routinely for crudes used at all of our refineries. For those analyses, we typically evaluate the product value for the lowest price dispositions against the highest laid-in crude cost. A similar approach was used for the analysis of the Chaffee and Eureka crudes. [Footnote omitted.]

(Queenan Report at 2.)

229. Mr. Queenan calculated marginal crude values for Penn Grade, Corning, Eureka and a crude known as Illinois Ba-

sin for the period July 1993 to June 1995. Mr. Queenan calculated these marginal crude values based upon Pennzoil's model of marginal crude values for its Rouseville refinery. (*Id.* at 4.) Plaintiffs' economist, Dr. House, then used those marginal crude values in calculating damages for the class period.

230. More specifically, the marginal crude values of Penn Grade, Corning, and Eureka crudes were compared to Illinois Basin, which was selected as a benchmark crude. (*See* Expert Report of Donald J. House, dated November 1, 1995; Revised Report of Dr. House, dated January 3, 1996, hereinafter "Revised House Report".)

231. According to the expert report of Dr. House, Illinois Basin was selected as a benchmark crude based upon four important facts:

> (1) Illinois Basin was identified by Pennzoil as a potential substitute crude;[16]
>
> (2) Illinois Basin is produced geographically near the refineries (although more distant than Appalachian crude oil production);
>
> (3) Competitively determined prices of Illinois Basin could be observed; and
>
> (4) Illinois Basin's physical and chemical properties are known.

(Revised House Report at 9.)

232. Dr. House calculated a percentage underpayment applicable to crude oil sold by class members. His methodology was as follows:

> (1) The Marginal Crude Value of Illinois Basin crude was determined.
>
> (2) The Marginal Crude Values of Penn Grade, Corning and Eureka crudes were determined.

---

16. This assertion is apparently based on a document produced during discovery and identified as "PC 306931." This document states that "Illinois Basin crude is an alternate crude for the Rouseville refinery. The Illinois Basin crude assay is basically the same as the Eureka." (*See* Notice of Filing by Class Counsel of Pennzoil Document PC 306931 [Doc. No. 261].)

(3) The dollar per barrel differences between the marginal crude values of Penn Grade, Corning, Eureka and that of Illinois Basin were next determined.

(4) Those dollar per barrel differences were then divided by actual posted prices for Penn Grade, Corning, and Eureka for each month from the period July 1, 1993 to June 30, 1995 resulting in a percentage difference or percentage undercharge.

(5) The weighted mean of those 24 percentages was calculated for Penn Grade, Corning and Eureka.

(6) The resulting mean percentages were multiplied by actual posted prices to determine a dollar per barrel underpayment.

(Revised House Report at 10.)

233. For the period January 1990 through June 1995, roughly the statute of limitations period, Dr. House estimated damages to be approximately $74 million. Dr. House's revised damage report calculated damages for January 1, 1990 to March 31, 1990 at approximately $4.4 million. Thus, damages for the statute of limitations period beginning mid-April, 1990 are more accurately estimated at $70 million. (*See* Revised Volume and Damage Table to Rule 26 Expert Report of Donald H. House, filed April 10, 1996.) For the entire period January 1981 to June 1995, Dr. House's damage estimate totaled approximately $271 million. (*Id.*)

234. Plaintiffs' pre-April 1990 claims are dependent on establishing fraudulent concealment. As described above, it was unlikely that Plaintiffs would be able to demonstrate fraudulent concealment of the alleged conspiracy because many of the producers suspected price fixing for years, the posting of prices through OOGA was known for years, and the parallel pricing pattern of Defendants' prices was also known for years.

a. *Defendants' Criticisms of Plaintiffs' Damage Theory*

235. Defendants strongly disagreed with the damage theory presented by Plaintiffs and challenged virtually every element of Dr. House's damages estimate. (*See generally* Expert Reports of Lester Lave and Joseph Kalt and Defendants' Memorandum in Support of Settlement Agreement.) Defendants' criticisms of Plaintiffs' damage claims included the following points that were set forth in their Memorandum in Support of the Settlement:

- Plaintiffs' benchmark crude, Illinois Basin, was inappropriately chosen inasmuch as: it was never actually refined by any of the Defendants; there was evidence that the slightly higher sulfur content of Illinois Basin made it unacceptable for use in Witco's refinery; and there were serious questions whether it could be processed safely and economically at Pennzoil's refinery. (Pennzoil Ex. E [Ex. 12 at 49–50]; Pennzoil Ex. D at 33.)

- Dr. House's monthly comparisons of marginal crude values reveal wide fluctuations, month to month, in the differences between Penn Grade and Illinois Basin. (Pennzoil Ex. E [Ex. 12 at 54–56].) During some months, the difference between the two is actually negative, suggesting that prices for Penn Grade were "too high" (relative to the "competitive" price) during those months. (*Id.* at 55.) Defendants contend that the magnitude of these fluctuations shows that Dr. House's method is inherently unreliable, and that his decision to average the monthly differences during this two-year period and then apply the average to the fourteen-year period in question is highly suspect. (Pennzoil Ex. E [Ex. 12 at 54–57]; Pennzoil Ex. D at 36–37.) Defendants further point out that the expert who assisted Dr. House in his calculations, Mr. Queenan, testified at deposition that not one of the accepted statis-

tical tests for accuracy was applied to these calculations. (Pennzoil Ex. G–10 at 317.)

- Plaintiffs measured damages from July 1993 to June 30, 1995 and applied that measure retroactively. Defendants claimed this "backcasting" approach was flawed because economic conditions in the earlier years were significantly different than in the two year sample period. (Pennzoil Ex. E [Ex. 12 at 56–57]; Ex. D at 26–27, 35–36.)

- Since Dr. House expressed the alleged underpayment as a percentage of the price actually paid for crude oil rather than as a dollar amount per barrel, Defendants claimed that the Plaintiffs' calculation of damages would be higher the more Defendants actually paid for crude.

- The Defendants' refineries were operating at full capacity and there was no shortage of crude. A successful conspiracy requires that demand be held down—which did not occur. (Pennzoil Ex. E [Ex. 12 at 16]; Pennzoil Ex. D at 38.)

- The methodologies employed by Plaintiffs' experts were subject to serious challenge under *Daubert*.

- Defendants' experts expressed the opinion that the Class actually suffered no damages. (Pennzoil Ex. D at 36–37; Pennzoil Ex. E [Ex. 12 at 63–64].) In support of this opinion they pointed out, first, that several firms that bought substantial quantities of Penn Grade crude oil during the life of the alleged conspiracy were not alleged to have been members of the conspiracy. These firms include Ashland, which operated a large and efficient refinery at Cattlettsburg, Kentucky and which processed Penn Grade crude throughout most of the alleged conspiracy, and United Refining which, from time to time, purchased Penn Grade crude for its refinery at Warren, Pennsylvania. Defendants' experts argued that, with such substantial buyers operating outside the alleged

conspiracy, there would have been no way for Defendants to succeed in holding the price below competitive levels even if they had conspired to do so: if the price were temporarily driven below competitive levels, one of the non-conspiring buyers would have begun buying Penn grade crude and the price would have been bid back up to competitive levels. (Pennzoil Ex. E [Ex. 12 at 36–41]; Pennzoil Ex. D at 40–43.)

- Defendants' experts also pointed out that numerous Appalachian refineries were closed or went bankrupt during the alleged conspiracy period. (Pennzoil Ex. E [Ex. 12 at 13–15, 20–21]; Ex. D at 38.) Indeed, as Defense Counsel pointed out during the settlement hearing, Judge Rosenberg's 1965 opinion in *United States v. Pennzoil Co.*, 252 F.Supp. 962 (W.D.Pa.1965), observed that there were ten refineries then processing Appalachian crude oil. Thirty years later, there were only three refineries processing Penn Grade crude on a regular basis—i.e. Pennzoil's Rouseville, West Virginia refinery; Witco's Bradford, Pennsylvania refinery and Quaker State's Newell (Congo) refinery. Defendants argued that this phenomenon is inconsistent with Plaintiffs' theory of a pricing conspiracy. They note that it is puzzling that, despite an alleged conspiracy among refiners to keep crude oil prices low, so much refinery capacity has proved to be uneconomic. Defendants' experts argued that if Penn Grade prices had been higher than they actually were (as required by Plaintiffs' damage theory), even more refinery capacity would have been retired, thereby further shrinking demand for crude oil. If this happened, the laws of supply and demand would have caused the price of crude oil to fall, according to Defendants' experts. In short, Defendants' experts argued, higher crude oil prices were unsustainable. (Pennzoil Ex. E [Ex. 12 at 20–21, 42–44]; Pennzoil Ex. D at 17, 38–39, 42.) Defendants argued

that, without proof that prices in the assumed "competitive" world would have been higher than prices actually were, there is no basis for awarding any damages to the Class.

b. *Plaintiffs' Expert Rebuttal Reports*

236. In response to Defendants' expert reports, Plaintiffs submitted rebuttal reports from the following experts: Dr. Kevin Neels (impact and damages); Dr. Thomas Saving (the appropriateness of backcasting damages); and Muse, Stancil & Co. (refinery experts). Plaintiffs' rebuttal experts opined that Plaintiffs' experts were correct and that Defendants' experts were wrong in their criticisms of Plaintiffs' damage theories.

237. For example, Dr. Neels opined in his rebuttal report that Ashland merely set a floor price for Penn Grade crude, but the alleged conspiracy could have worked without Ashland as a participant. (Neels Rebuttal Report at 2–5, 2–6.)

238. As noted above, Defendants' experts had claimed that the use of Illinois Basin as a benchmark crude was flawed because Illinois Basin was not a crude actually processed (or capable of being processed) by any of the Defendants. According to the Defendants' experts, under a value parity analysis, the benchmark crude had to be a crude actually processed by the Defendants. Accordingly, in his rebuttal report, Dr. Neels used Eureka crude as a benchmark crude and calculated damages in the range of approximately $25 to $29 million. (Neels Rebuttal Report at 3–2, 3–3 and Exhibits 5 and 5a.)

239. The expert report of Ray Stancil of Muse, Stancil & Co. opined that the Rouseville refinery would have been routinely capable of processing in excess of 2,500 to 5,500 barrels per day of Illinois Basin Crude. (*See* Rebuttal Report of Muse Stancil & Co. at 2–3; 16.)

240. In rebuttal to the defense experts' opinions that it was improper to backcast damages found for the period July 1993 to June 30, 1995, Dr. Thomas Saving concluded that backcasting was appropriate if the price elasticity of supply remained relatively constant or was lower during the backcasting period. (Saving Rebuttal Report at 3.)

241. At the time the Settlement Agreement was reached between Plaintiffs and Witco and Pennzoil, there was pending a motion by Defendants to strike these expert reports on the ground that the opinions expressed therein were not properly "rebuttal," but rather were new opinions that could and should have been expressed as part of the Plaintiffs' initial expert disclosures.

242. After the Settlement Agreement was reached, the Court denied this motion without prejudice to being later refiled, if necessary. Nevertheless, substantial questions have been raised with respect to Plaintiffs' damages estimate, which would be the subject of Defendants' impending motions to strike the damage estimate under *Daubert* and for summary judgment.

243. In light of all of the foregoing, Plaintiffs face substantial risks in establishing their damages.

c. *The Objectors' Damages Theory*

244. As we have previously observed, the Lazy Oil Objectors argue that the Settlement is inadequate in part because it ignores the element of lost profits that class members would earn if crude oil prices had been higher—the theory being that higher prices would have enabled class members to produce more crude oil by bringing shut-in wells back into production and by drilling new wells.

245. As is noted above, the Lazy Oil Objectors called two expert witnesses, a petroleum engineer and a geologist, to testify in support of the "lost profits" theory. Neither of these witnesses, however, expressed the opinion that any class member actually did suffer "lost profits" damages that were not accounted for in Dr. House's damage estimate. Rather, both witnesses

testified that it might be possible to determine "lost profits" on a class-wide basis, after a team of several experts had been assembled and had spent three to six months gathering geologic and operating data relating to the Appalachian Basin as a whole. (Tr., Vol. I at 79–81, 89, 118–20).

246. We have previously found that, for several reasons, the Lazy Oil Objectors' "lost profits" theory is seriously flawed and provides no basis for disapproving the Settlement. Among other things, the Objectors offered no support whatever for key elements of their theory, including: (a) whether prices in the absence of the alleged conspiracy would have been higher than they actually were for periods long enough to stimulate additional production;[17] (b) what price would have been paid for crude oil in the absence of the alleged conspiracy;[18] and (c) whether (assuming an increase in oil production) higher prices could have been sustained in light of the uncontradicted fact that the Defendants' refineries were running at economically full rates during the time of the alleged conspiracy.[19]

247. In addition, as discussed above, the "lost profits" theory would require a highly individualized inquiry, class member by class member, into both the fact of injury and the amount of lost profits suffered by each member of the Class. Although the Lazy Oil Objectors' petroleum engineering witness, Mr. Victor Henderson, testified that it would be possible to determine aggregate lost profits on a basin-wide basis in the manner of a "mass appraisal" performed for tax purposes, it is clear that any such basin-wide analysis would require one to make assumptions about "typical" class member circumstances and costs when in fact it appears that no such "typical" set of conditions exists. Numerous witnesses agreed that there are wide variations among class members with regard to: (a) whether a class member would be able to increase production—e.g., whether a class member has shut-in wells or land on which to drill new wells (Tr., Vol. I at 95); (b) whether a class member would drill new wells if oil prices increased to a particular price level (*id.* at 96); (c) the costs of increasing production—i.e., the costs of bringing old wells back into production and the costs of drilling new wells (*id.* at 93, 94, 104–05, 115); (d) the costs of operating wells;[20] and (e) the quantity of increased production possible for a given class member (which would depend on the age of a class member's shut-in wells and the "decline curve" applicable to his wells) (Tr., Vol. I at 95–96, Vol. II at 19–20). Even if increased production did occur, it would not be possible to distinguish increased production by class members from increased production by Defendants or other non-members of the Class without individualized inquiry. (Tr., Vol., I at 102.) Individual questions would likely predominate over common ones, and it is therefore highly questionable whether this approach

---

17. One of the Objectors' witnesses, William Henderson, testified that prices would have to remain at higher levels for at least a year or more before producers would be able to afford to drill new wells or refurbish old ones. (Tr., Vol. II at 26–27.)

18. Although Bennie Landers testified that he disagreed with Dr. House's estimate of the "conspiratorial underpayment," (Tr., Vol. II at 50, 115), he was unable to offer any estimate of his own regarding the extent of the "underpayment" resulting from the alleged conspiracy. (Tr., Vol II at 80–81.)

19. Class Counsel's economic expert, Dr. Kevin Neels, testified that, even under extremely conservative assumptions regarding the quantities of additional crude oil that the "lost profits" theory presupposes, prices would have actually fallen if additional oil were introduced into a market situation where Defendants' refineries were operating at economically full rates. (Tr., Vol. II at 236–39.)

20. While Bennie Landers testified that his "lifting costs" were approximately $17 per barrel (Tr., Vol. II at 41), another class member, William Henderson, testified that his lifting costs were approximately $21 per barrel (Tr., Vol. II at 12).

to damages would be suitable in a class action.

### 6. Risks of Maintaining the Class Action

248. Based upon the damage theory set forth by Plaintiffs, there was little risk that Plaintiffs would be unable to maintain the certified class throughout the proceedings. (This of course is not meant to prejudge unexpected developments in the litigation.) The Court considers that this factor has little bearing on whether the Settlement Agreement should be adopted.

249. The Court believes, however, that if the Plaintiffs' litigation proceeded under the lost profits theory of damages, there would be considerable risk that the litigation could not continue as a class action. Indeed, during these final approval hearings, counsel for Pennzoil represented to the Court that, if the theory of damages changed to a lost profits measure, the Defendants would seek to have the class decertified. (Tr., Vol. III at 137.)

### 7. The Ability of Defendants to Withstand a Greater Judgment

250. We next consider the Defendants' ability to withstand a larger judgment. No evidence was offered on this issue except for the Lazy Oil Objectors' proof concerning Pennzoil's estimated market share of national sales of motor oil, which has little bearing on this issue. (See Lazy Oil Ex. 11.) The Court presumes that Defendants have the financial resources to pay a larger judgment. However, in light of the risks that Plaintiffs would not be able to achieve any greater recovery at trial, the Court accords this factor little weight in deciding whether to approve the proposed Settlement.

### 8. The Range of Reasonableness of the Settlement in Light of the Best Recovery and Attendant Risks of Litigation

251. The settlement amount represents a substantial percentage of the Plaintiffs' experts' damage estimates for the statute of limitations period. Using a marginal crude value analysis, Dr. House estimated damages for the period January 1990 through June 1995 at approximately $74 million.[21] The Pennzoil and Witco settlement amount, $14.5 million, represents 19.59% of that estimate. Together, the Quaker State settlement and the Pennzoil/Witco settlement, with a combined recovery of $18.9 million, represents 25.5% of that estimate.[22]

252. Dr. Kevin Neels, one of Plaintiffs' rebuttal experts, prepared an alternative analysis using Eureka crude as a benchmark, that resulted in a damage estimate for the same period of $25–$29 million. (Neels Rebuttal Report at Ex. 5 and 5a.)[23] The Pennzoil and Witco Settlement amount represents 50–58% of that estimate. Together, the Quaker State and the Pennzoil/Witco settlements represents roughly 65–76% of that estimate.

253. Dr. House's estimate of damages for the entire alleged conspiracy period (1981–95) was $271 million. However, that figure was subject to serious challenges by the Defendants, including: (I) Defendants' argument that the Class was barred from

---

**21.** This estimate was the result, in part, of "backcasting" a percentage underpayment Dr. House computed for a sample period (1993–1995) to make it applicable to earlier years in the period. We have previously noted that Defendants' experts challenged Dr. House's use of backcasting in the circumstances of this case. Without backcasting, Dr. House's damages estimate for the two-year sample period was $23 million.

**22.** As noted above, the period of damages under the statute of limitations without any

extension thereof extends back to April 1990. Therefore, the damages are slightly lower than $74 million for this period, or approximately $70 million. With damages during the statute of limitations period estimated at $70 million, the Settlement represents 20.7% of damages. Similarly, combining the Quaker State Settlement, the percentage is 27%.

**23.** Our review of the Revised Exhibits 5, 5a and 11 to the Rebuttal Report of Dr. Neels (filed under seal) suggests that this figure was subsequently amended to $24–28 million.

recovering any damages for alleged violations prior to April of 1990; (ii) their objection (as previously noted) to the use of "backcasting" as a means of estimating pre–1993 damages; and (iii) numerous arguments challenging the conceptual integrity of Dr. House's damages calculation (including, *inter alia,* objections to the selection of Illinois Basin as a benchmark crude, the use of Pennzoil's Rouseville Refinery as a sample refinery, and the use of a weighted mean average of the percentage undercharge in computing damages). While we do not here engage in a trial of the merits, in light of the many potential problems which the Class faced in establishing its case, the Court considers it unlikely that Plaintiffs could have succeeded in establishing damages in the range of $271 million. Accordingly, although the Settlement represents only about 5.35% of the estimated damages for the entire class period, we do not find this figure to be unreasonable under the circumstances here.[24]

254. Some objectors claim that the Court should consider the fact that treble damages would automatically be awarded, even if the Class recovered only for the statute of limitations period. Assuming an award of $70 million for the limitations period, trebling would result in an award of $210 million. The Settlement amounts to approximately 6.9% of that figure. Combined, the Quaker State settlement and the Pennzoil/Witco settlement amount to 9% of that figure. However, most of the challenges to the Class's damages claim, as outlined above, would still need to be overcome even if damages were limited to the statute of limitations period. Further, in light of numerous complex issues concerning, *inter alia,* the effects of Defendants' pricing system and the economic forces affecting the crude oil market (all of which were hotly disputed by the parties)

the Class faced substantial risks in establishing the Defendants' liability.

255. By any of the foregoing measures, the Settlement amount is fair, reasonable and adequate in light of the best possible recovery and the risks attendant to the Plaintiffs' claims.

256. In addition to the monetary component of this Settlement, the Settlement also provides a change in the manner that Pennzoil will communicate with the Ohio Oil & Gas Association. Specifically, it provides that "Pennzoil and Witco, without admitting that communication with OOGA about any subject is unlawful, each agree to the entry of a Consent Order in the Final Judgment requiring each of them to direct the Ohio Oil and Gas Association ("OOGA") to refrain from initiating communications with either of them regarding a competitor's price for Penn Grade crude oil, except permitting such communications to ascertain a competitor's currently-effective posted price when there is no other available public source of information (other than a newspaper) concerning that competitor's currently effective posted price." Such Consent Order shall expressly permit Pennzoil and Witco individually to notify OOGA of changes in their own posted prices." (Agreement of Settlement Between Plaintiff Class and Pennzoil Company, Pennzoil Products Company and Witco Corporation ¶ 9.) The Objectors seek disapproval of the Settlement because they feel that this injunctive relief does not go far enough.

257. The Lazy Oil Objectors complain that the Settlement (1) does not specifically enjoin Pennzoil and Witco from price-fixing and (2) does not guarantee producers a stable higher price for their crude oil in the future. In their Memorandum in Opposition to Settlement Approval, the Objectors stated that "the proffered settlement is inadequate on its face [because of]

24. It also bears noting that, notwithstanding Mr. Landers's criticism of the Settlement amount and the methodology used to compute damages, Mr. Landers admitted during

the testimony that he was incapable of determining what was a fair market price for Penn Grade crude. (Tr., Vol. II at 81.)

the refusal of the Defendants to enter into any significant covenant concerning their conduct into the future .... the agreement should at least contain affirmative covenants on which the Plaintiffs can rely into the future." (Mem. in Opp. to Settlement Approval [Doc. No. 180] at 3–4.) In his testimony, Bennie Landers answered "yes" when the Court asked if he was "looking for an agreement with respect to future oil prices that they would be stabilized at a particular price and held at a particular price or a particular period of time." (Tr., Vol. II at 74–75.) Mr. Landers agreed that what he is "really looking for is to stop [Defendants] from doing what they were doing." (*Id.* at 76.)

258. To find the Settlement unreasonable because of the absence of an injunction that proscribes future conduct would, in effect, require an admission of guilt by Defendants. Pennzoil and Witco deny that they have engaged in price-fixing and are entitled to do so while settling the lawsuit. Further, to the extent the Objectors suggest that the Settlement is unfair unless Defendants agree to tie their future prices to some other benchmark, such as the selling price of West Texas Intermediate crude on the New York Mercantile Exchange (*see* Tr., Vol. II at 95), or stabilize oil prices at a particular price for a particular period of time (*see id.* at 74–75), the Court is not persuaded. Such an injunction would turn the antitrust laws on their head by removing market forces from future pricing decisions and forcing Defendants to agree on the price at which they will purchase Plaintiffs' crude. Even if the Plaintiffs were completely victorious at trial, they would not be entitled to a judgment guaranteeing them a future minimum price or protecting them from the vagaries of the crude oil market in any other manner. That is precisely what Class Counsel advised class representative Benny Landers. It is not the province of the Court to renegotiate the Settlement, and the Settlement cannot be considered unfair in the absence of this term.

259. The New York Objectors ask for an injunction that would prohibit price changes for a ten-day period after a competitor changes its price. (*See* Mem. of Law Submitted By Eight Certain Class Members In Opposition to the Settlement [Doc. No. 201] at 18). Such an injunction would not only be anticompetitive, but would actually be detrimental to members of the Plaintiff Class in the face of a price increase announced by a purchaser who was not subject to the injunction, by preventing one purchaser from raising its price to match the price increase.

260. Finally, the requested injunctive relief is inappropriate on the facts. Witco has sold its lubricants division, including the Bradford Refinery, to third parties, and Witco is no longer in the business of purchasing Penn Grade crude. Therefore, any injunction against it would be meaningless. Quaker State has already settled and was not enjoined. There was no objection to that settlement on the ground that it did not include injunctive relief. Bennie Landers sold virtually all of his oil to Quaker State, and yet did not object to the Quaker State settlement. (Tr., Vol. II at 112.) In addition, Quaker State is in the process of selling its Congo Refinery and therefore will no longer be in the business of buying Penn Grade crude. Quaker State cannot be enjoined by this Settlement and, even if it could be, any injunction against it would be meaningless.

261. An injunction that would bar only Pennzoil from conspiring with others who are, by virtue of their absence, incapable of conspiring makes no sense. Therefore, it is not unreasonable that the Settlement contains no such term.

### 9. *Other Factors Regarding the Settlement*

262. The Court has also considered the Affidavit of Arlin M. Adams concerning the fairness of the Settlement. (*See* Doc. No. 225.) Although none of the findings herein or the conclusions of law set forth below are dependent upon the Affidavit of

Judge Adams, the Court has nonetheless considered the views of this respected former Third Circuit judge and finds them persuasive.

■ 263. Considering all the foregoing facts and circumstances, the proposed settlement with Witco and Pennzoil is eminently fair, reasonable, and adequate.

## D. THE ALLOCATION OF SETTLEMENT PROCEEDS

264. Both the Quaker State and the Pennzoil/Witco Settlement Agreements provide that, upon the Settlement becoming final, the Settlement Funds may be distributed in accordance with the plan of allocation and distribution to be submitted by Class Plaintiffs subject to approval by the Court. (Quaker State Settlement ¶ 10; Pennzoil/Witco Settlement ¶ 16.)

265. An allocation plan of the settlement proceeds has been submitted to the Court by Class Counsel. Under the proposed allocation plan, which was described in the mailed class notice, class members are required to submit a proof of claim form, identifying their dollar amount of sales of Penn Grade crude to the Defendants for any five years during the Class Period. The dollar amount of sales for Penn Grade and Corning crudes will be given equal weight. Sales of Eureka crude will be discounted 40%. Class members can submit claim forms based upon direct sales of Penn Grade crude during any five years of the class period January 1, 1981 through June 30, 1995.

266. The Plan of Allocation was arrived at without the agreement or participation of Defendants, is not part of the Settlement Agreement, and is the subject of a separate motion by Class Counsel for approval by the Court. Based on the record currently before us, the Court continues to have reservations about the proposed plan of allocation. Consequently, the Class's motion for approval of the proposed allocation scheme will be denied without prejudice, pending further proceedings.

## E. CLASS COUNSELS' APPLICATION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES & THE OBJECTORS' MOTION FOR AN INCENTIVE AWARD

267. The notice that was sent to class members informing them of the proposed Pennzoil/Witco Settlement also advised that Class Counsel would request reimbursement of their out-of-pocket expenses as well as fees not to exceed one-third of the combined settlements with Pennzoil, Witco and Quaker State. Class Counsel have filed a motion for an award of attorneys' fees in the amount of $6.35 million and unreimbursed expenses in the amount of $486,165.[25]

268. The combined totals of the Quaker State settlement and the Pennzoil/Witco settlement is $18.9 million, plus accrued interest, plus $250,000 for costs and expenses of notice and administration of the settlements. As of March 31, 1997, the accrued interest to the Quaker State settlement was approximately $100,000; the interest attributable to the Pennzoil–Witco settlement fund is approximately $75,000. (Aff. of Howard J. Sedran, Esq., Ex. to Mem. in Supp. of Application for Award of Attorneys' Fees and Reimbursement of Expenses [Doc. No. 211] at Ex. E.) Thus, the requested fees comprise approximately 33.3% of the total combined settlements plus accrued interest as of March 31, 1997.

### 1. The Request for an Award of Attorneys' Fees

269. Various class members have objected to Class Counsels' fee request. The New York Objectors contend that the request is excessive and that Class Counsel should not receive more than a 10% award. Class member Beldon & Blake Corporation also objects to the fee request and urges the Court to award no more than

---

**25.** Expenses through late March, 1997 totaled approximately $426,228. By way of supplemental affidavits, Class Counsel have requested additional expenses for the period postdating March 31, 1997 in the amount of approximately $59,937.

20% of the fund. The West Virginia Objectors likewise object that the requested fees are excessive; however, they make no recommendation as to what percentage fee should be awarded.

■ 270. The Court finds, based upon an extensive review of awards in class action suits, discussed *infra*, that an award of attorneys fees in the amount of 25% of the Settlement funds is appropriate as an initial benchmark figure. Accordingly, the Court will consider other factors informing our award of attorneys' fees in light of this benchmark figure to determine whether an adjustment is appropriate. Among the factors we will consider are: the size of the settlement fund; Class Counsels' experience and competency; whether Class Counsel acted in the best interests of the Class; the percentage fee that might have been negotiated as a private contingent fee; the stage of the litigation at which the Settlement was obtained; the novelty of issues and any other factors unique to this litigation.

271. The amount of the combined settlement fund is $18.9 million. This figure, while not amounting to a "megafund," is nevertheless substantial. The Court is therefore mindful that, in assigning a "percentage of recovery" fee award, our award should protect class members against the possibility of a windfall to Class Counsel.

272. In considering the experience and competence of the class attorneys, the Court notes that the Class was represented by very competent attorneys of national repute as specialists in the area of complex litigation. As such, Class Counsel brought considerable resources to the Plaintiffs' cause. The Court has had the opportunity to observe Class Counsel first-hand during the course of this litigation and finds that these attorneys provided excellent representation to the Class. The Court specifically notes that, at every phase of this litigation, Class Counsel demonstrated professionalism, preparedness and diligence in pursuing their cause.

273. The Court further notes that it is equally impressed by the quality of representation provided by counsel for the Defendants. They too demonstrated a high degree of professionalism and were notably prepared and vigilant in defending their cause. We recognize, therefore, that Class Counsel faced a formidable task in prosecuting this case.

274. With regard to the novelty of issues involved, the Court notes that this was a very complex antitrust case involving expertise in antitrust law, economics and oil industry matters. Class Counsels' vigorous prosecution of this case resulted in a sizeable recovery within approximately three years. The Court considers this to be a relatively efficient result for the Class, particularly in light of the inevitably protracted nature of class action litigation and the likelihood that any disposition of this action would have resulted in an appeal.

275. We also consider the percentage fee that might have been negotiated as a private fee. Here, Class Counsel have represented that they did in fact privately negotiate with the named class representatives for a 33 and ⅓ % contingency fee, in the event that the case was not certified as a class action lawsuit. We note, however, that any recovery Class Counsel might have been able to achieve under such circumstances would have likely been only a fraction of the recovery obtained here, since the element of class-wide damages would have been lacking. The percentage of recovery for attorneys' fees is usually inversely proportionate to the size of the plaintiff's recovery. Accordingly, the fact that a one-third contingency fee was negotiated with the named Plaintiffs as private litigants does not necessarily lead us to conclude that a one-third fee is appropriate in the context of a class-wide recovery.

276. Finally, we consider the stage of litigation at which the settlement is reached. Here, the Proposed Settlement came after the lion's share of discovery had been completed and the parties were

in a position to evaluate the relative strengths and weaknesses of each side's case. In addition to noting the vast amount of work which was required in prosecuting this case, we also note Class Counsels' representation that their involvement in this litigation required them to abstain from working on other matters.

277. On balance, the Court finds that an award of attorneys' fees in the amount of 28% of the settlement fund (including interest) is fair and appropriate, taking all of the foregoing factors into account. By the Court's calculations, this yields a figure of $5,341,000.

278. Class counsel urge that an analysis of the lodestar approach confirms the reasonableness of their fee request. Counsel represent that they have spent an aggregate of at least 28,163 hours in the prosecution of this case, producing a lodestar amount of $6,393,167.00.

279. The Court has thoroughly reviewed Class Counsels' documentation in support of their requested fee and finds that there is some evidence of a duplication of effort. First, we note that some eleven different law firms have combined resources to represent the Class. Whenever such a vast panel of attorneys are working on the same case, it would seem inevitable that some duplication of effort results. Counsel have not supplied sufficient documentation to enable the Court to determine whether all the hours spent reflect non-duplicative efforts to litigate the case. We note, for example, Beldon & Blake Corporation's objection that the number of hours being billed for each day of deposition is (allegedly) excessive. Also noteworthy is the fact that $414,991 is being sought for preparation of pleadings and motions; $274,693.75 is being sought for "research" and $383,409.25 is sought for time spent on "case planning and organization; strategy." Further, Beldon & Blake points out that the total number of hours billed for document review is equivalent to 21 persons reviewing documents for 50 hours per week for three months. Notwithstanding the complexity of this case and the volume of document production that occurred here, this figure strikes the Court as somewhat high.

280. In addition, it does appear to the Court that certain functions were occasionally performed by counsel billing at higher hourly rates where a less senior attorney and/or paralegal may have sufficed to perform the same task. Due to the generalized nature of Class Counsels' documentation in support of their fee request, the Court is unable to determine the specific tasks performed by counsel and the reasonableness therefore.

281. The Court concludes, based on the foregoing factors, that a reduction in the lodestar amount is appropriate and in line with the Court's award of a percentage-of-recovery fee in the amount of 28% of the combined settlement fund.

### 2. The Request for Reimbursement of Expenses

282. Class Counsel have also requested reimbursement of certain expenses totaling $486,165. While some class members have lodged vociferous objections to Class Counsels' request for attorneys' fees, no members have seriously contested Class Counsels' petition for reimbursement of expenses.

283. This case has been an expensive case to prosecute in light of the complexity of the legal and factual issues, the necessity of acquiring expert testimony on a variety of issues, the voluminous documentation at issue, the travel involved, and the numerous depositions of fact and expert witnesses. In particular, we reiterate that settlement was achieved only after the vast bulk of discovery had been completed. In addition, class counsel have invested over $2,000,000 at their own expense in order to meet the costs of this litigation.

284. The Court has reviewed Class Counsels' petition for reimbursement of expenses and finds that such expenses are adequately documented and were reason-

ably and appropriately incurred in the prosecution of this action.

285. The Court will grant Class Counsels' petition for reimbursement of expenses in the amount of $486,165.

### 3. The Representative Plaintiffs' Motion for an Incentive Award

286. The Court also has before it a motion by three representative Plaintiffs—Lazy Oil Co., John B. Andreassi and Thomas A. Miller Oil Co.—for incentive awards in the amount of $100,000 each. These moving Plaintiffs base their request for an incentive award on the role that they played in initiating the instant action, retaining counsel to prosecute the class claims, actively participating in the litigation, assisting Class Counsel, and acting as a liaison to absent class members.

287. At the hearing on the proposed Witco/Pennzoil settlement, the Court heard testimony from Bennie Landers, president of Lazy Oil Company, regarding his efforts on behalf of the class. Mr. Landers introduced an exhibit at the hearing which purported to compute the value of the services he has provided in the prosecution of this case, as compiled from telephone bills and other personal records. In total, Mr. Landers purported to document $135,882 in fees and expenses, the vast bulk of which constituted compensation for the time he allegedly has spent on the case, calculated at an hourly rate of $50.[26]

288. No records or testimony were submitted to document the basis for an incentive award for either Thomas A. Miller Oil Co. or John B. Andreassi.

289. Class Counsel have filed a memorandum in opposition to the requested incentive award on behalf of the Class, arguing that the requested awards are excessive and disproportionate to the respective contributions made by each of the named representatives. Class counsel recommend that an award be made in the amount of $20,000 for Lazy Oil Co. and $5000 for each of the remaining class representatives.

290. Based upon the testimony, exhibits, and other submissions to the Court, we make the following findings relative to the motion for an incentive award:

291. Thomas A. Miller Oil Co., through Thomas Miller, assisted the Class's efforts by: (1) obtaining for Class Counsel a summary price chart reflecting the prices that Witco paid for oil over a period of 10 years; (2) providing information about a conversation that Mr. Miller believed would be useful in proving the alleged conspiracy; (3) producing documents in response to the Defendants' discovery requests; (4) appearing for deposition; and (5) attending the hearing before this Court in connection with our approval of the Quaker State settlement.

292. Mr. Andreassi assisted the Class's efforts by: (1) producing documents in response to Defendants' document requests; and (2) appearing for a brief deposition.

293. The efforts of Messrs. Miller and Andreassi, while not inconsequential, do not merit an incentive award of $100,000. Indeed, the Court finds that these efforts do not merit an incentive award beyond the type of benchmark award typically awarded by courts in this circuit. An

---

**26.** Mr. Landers estimated that he has spent approximately 10 hours per week on this case, or 520 hours per year, for each of the years 1994, 1995 and 1996. Similarly, for the 17 week period of January 1 through April 26, 1997, he estimates a total of 170 hours spent on the case. Totaling these hours (i.e. 1730 hours for the period January 1994 through April 1997) and multiplying his estimated fee of $50 per hour, this yields a total of $86,500.

In addition, Mr. Landers seeks payment in the amount of $36,450 for approximately 729 hours spent on the telephone during 1994, 1995 and 1997 communicating with others about the case (again, at a fee of $50 per hour). Finally, Mr. Landers seeks payment in the amount of $12,932 for services and expenses incurred during 1996 in connection with the case.

award of $5,000 each for Messrs. Miller and Andreassi is fair and appropriate based on the record here.

294. Lazy Oil Company, through its principal Benny Landers, has made a greater contribution to the Class litigation than the other class representatives. Mr. Landers did provide articles and other literature to Class Counsel that he believed would assist counsel in becoming educated about the oil industry. In addition, Mr. Landers was the key individual responsible for initiating this lawsuit and retaining counsel. During the course of discovery, Mr. Landers assisted in document production, attended four days of deposition, investigated certain leads that he felt would assist the Class, and served as a de facto liaison to many absent class representatives. Nevertheless, the Court finds that the foregoing services do not merit an award of $100,000.

295. The Court finds Mr. Landers's self-imposed fee to be excessive. In addition, Mr. Landers's time computations are no more than a rough estimate unsupported by actual time sheets or any particularized documentation and, for that reason, are not reliable. To the extent that Mr. Landers spent time communicating with others about the case, the Court credits Class Counsels' representation that such communications did not substantially benefit the Class.

296. The Court further credits Class Counsels' representation that Mr. Landers has already been reimbursed in the amount of $10,054.29 for actual, documented out-of-pocket expenditures. These include telecopier, automobile, and telephone expenses, along with other incidental documented expenses.

297. In addition, the Court credits Class Counsels' representation that Mr. Landers has spent a considerable amount of time on non-litigation matters, such as trying to convince refiners that they should change the formula by which they pay for Penn Grade crude, most of which provided no assistance to the outcome of this litigation. The Court further notes that Mr. Landers has been an active leader in the efforts of various Class members to oppose the instant settlement. However well intended these efforts (and the Court does not question Mr. Landers's good intentions), they have not enured to the benefit of class members. For the reasons previously set forth in detail, this Court has approved the Settlement as fair and reasonable and has found that the Lazy Oil Objectors' criticisms of the settlement are (for the most part) unfounded.

298. An incentive award of $20,000 for Mr. Landers is fair and appropriate based on this record.

### F. THE OBJECTORS' REQUEST FOR REMOVAL OF CLASS COUNSEL

299. The Lazy Oil Objectors have filed a motion seeking to remove one of the Co-Lead Counsel, Howard J. Sedran, from this case. On June 12, 1997, subsequent to the completion of the hearing on final approval of the Settlement, the Lazy Oil Objectors filed a motion for disqualification of all Class Counsel. The New York producers have not joined in the Motions of the Lazy Oil Objectors to disqualify Mr. Sedran and the other Class Counsel. (Tr., Vol. II at 120.)

300. The primary basis of the Lazy Oil Objectors' motion for the removal of Mr. Sedran and Class Counsel is the Objectors' dissatisfaction with the Settlement. The Objectors complain that Class Counsel should have utilized the lost profits damage theory advocated by the Objectors and further object that the Settlement amount is insufficient. "It is plainly apparent," the Objectors claim, "that Class Counsel negotiated a settlement and recommended same to the Representative Plaintiffs and the class without ever disclosing that he had, whether by error or intention, completely ignored an entire component of damages otherwise recoverable under applicable law." (Consolidated Br. of Lazy Oil Objectors [Doc. No. 265] at 30.) The

Objectors suggest that Class Counsels' handling of this case (and especially the Settlement) has resulted in an irreparable breach of trust between counsel, the Representative Plaintiffs and the members of the Class inasmuch as Class Counsel have "usurp[ed] the exclusive prerogative of the clients to determine their own fate with full knowledge of the choices." (*Id.* at 31.)

301. The Objectors also seek to disqualify Class Counsel on the ethical ground that each of Plaintiffs' attorneys is disqualified from taking any position on any issue adverse to the Objectors. The Objectors claim that, upon filing their motions to withdraw as counsel for the Lazy Oil Objectors, and particularly upon the granting of those motions, counsel became ethically bound to advance no position adverse to their former clients. Class Counsels' continued participation, it is urged, is a breach of that ethical prohibition.

302. The Lazy Oil Objectors have failed to identify "any concrete act of impropriety" by Mr. Sedran or any other of the class counsel which would warrant disqualification. *See Maywalt v. Parker & Parsley Petroleum Co.,* 67 F.3d 1072 (2d Cir.1995).

303. As discussed above, the lost profits damage theory advocated by the Lazy Oil Objectors was fraught with economic and legal problems, and the decision by Class Counsel not to utilize that damage theory does not constitute a legitimate basis for their disqualification. Class Counsel acted in the best interests of the Class in not consenting to the damage theory proposed by Mr. Landers. Mr. Landers is not an economist, a chemist or a petroleum engineer. (Tr., Vol. II at 57.)

304. The fact that Class Counsel made an effort to seek agreement from the Defendants to peg the prices of Penn Grade crude to the NYMEX price for crude refutes the Lazy Oil Objectors' claim that their settlement desires were entirely ignored by Class Counsel.

305. Moreover, Mr. Sedran kept Lazy Oil advised of the settlement discussions through Reid Eschallier, Esquire. (Tr., Vol. II at 153–54.) Mr. Landers testified that he had a line of communication with Mr. Sedran about the litigation through Mr. Eschallier. (*Id.* at 58–59.)

306. Moreover, when a difference of opinion arose between the Lazy Oil Objectors and Class Counsel concerning the Settlement, Class Counsel appropriately sought leave of Court to withdraw as counsel for the Lazy Oil Objectors.

307. There was no conflict of interest between Class Counsel and the absent class members requiring disqualification of Class Counsel. Class Counsel acted at all times in the best interests of the entire class.

308. The Objectors also complain that the recovery fund, while insufficient for the Class, will yield a substantial award of attorneys fees to Class Counsel. However, the fact that Class Counsel may recover a substantial fee award does not, in itself, suffice to show that the representation of counsel was inadequate or unethical.

309. This Court has overseen this case from its inception and has first-hand knowledge of the work performed by Class Counsel, both in terms of court appearances, pleadings, memoranda and other papers filed with the Court. The Court's own knowledge of the representation provided by Class Counsel to their clients and the Class leads it to conclude that throughout this litigation and the settlement negotiations, Mr. Sedran and Class Counsel have represented their clients and the Class in conformity with their fiduciary and professional obligations. They have zealously represented the best interests of the entire Class, and have negotiated settlements which have met with the approval of the vast majority of the Class members. The interests of class members have been adequately represented and protected, and the Lazy Oil Objectors have not demon-

strated any abridgement of class members' rights.

### G. THE MOTION FOR CERTIFICATION OF A SUB-CLASS

■ 310. Finally, the Lazy Oil Objectors have moved this Court for certification of a subclass comprised of all class members engaged in the business of oil and gas production. (Lazy Oil Objectors' Mot. for Certification of Independent Producer Subclass [Doc. No. 184].) The stated purpose of this proposed subclass is "to fairly distinguish between those members of the class who, in their capacity as mere investors in particular oil wells, have claims arising solely from any differential in price, and those members of the class who are or were actively engaged in the business of the production of oil." (Mem. in Supp. of Certification of Subclass [Doc. No. 186] at 1.) This distinction is necessary, it is claimed, in order to assure the fair treatment of class members' claims, since members who are mere investors (as opposed to producers) cannot as a matter of law press any claim for lost profits.

311. We have previously addressed the Lazy Oil Objectors' criticisms of the Pennzoil/Witco Settlement, particularly their objection that the Settlement is insufficient without adjusting the theory of damage to include compensation for class members' lost profits, and have found those criticisms unconvincing. Specifically, we have found that the lost profits theory of damages is less preferable in the context of this case than a price differential approach to damages because the former would yield a less reliable result and would require individualized inquiries ill-suited for class-wide resolution. As previously discussed, in attempting to apply a lost profits damages model, the Court would be required to examine each subclass member's financial history, costs of drilling, costs of production, opportunity for additional production and transportation expenses. Thus, the Court has serious res-

ervations as to whether the movants could satisfy the requisite element of typicality.

312. Further, we have specifically credited Dr. Neels's testimony that the price differential theory of damages is a "substantially complete" damages theory which captures the "vast bulk" of the damages in this case. (Tr., Vol. II at 229.)

313. We also seriously question whether the proponents of the subclass could satisfy the element of adequacy of representation. Specifically, we find convincing the argument that, because the market for Penn Grade crude is limited and members of the proposed subclass are competitors of one another, one member's ability to prove lost profits and/or business could very well come at the expense of another member's ability to do the same. In this regard, we note Dr. Neels's suggestion that, if one member of the proposed subclass drilled additional wells closer to the Defendants' refineries, the Defendants would presumably substitute that closer (and therefore cheaper) oil for another producer's more distant (and therefore more expensive) oil. (See Aff. Of Dr. Kevin Neels.) Thus, there is at least a potential that each member of the proposed subclass would be put in a position of direct conflict with the other members of the subclass.

314. Finally, we agree with Plaintiffs that the Lazy Oil Objectors have not adequately defined their proposed subclass for purposes of certification. The asserted basis for the subclass distinction between producers and investors is that investors may not bring a claims for lost profits. Depending on the definition, however, certain "investors" may arguably be able to assert lost profits and/or lost business claims. We also add that the movants have not identified under which prong(s) of Rule 23(b) they seek certification.

315. For all of these reasons, the Court finds that the Lazy Oil Objectors have not met their burden of demonstrating that certification of a subclass is appropriate. Because we find the motion for certifica-

tion of a subclass to be unfounded, that motion will be denied.

## II. CONCLUSIONS OF LAW

Based upon the foregoing facts, the Court makes the following conclusions of law:

### A. THE OBJECTORS' REQUEST FOR REMOVAL OF CLASS COUNSEL

1. As an initial matter, we conclude that there have not been any acts of impropriety, conflicts of interest, or abridgement of class members' rights on the part of any Class Counsel which would warrant their disqualification. *See Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1078–79 (2d Cir.1995), *aff'ing* 155 F.R.D. 494 (S.D.N.Y.1994). To the contrary, at all times in this litigation, Class Counsel have acted in the best interest of the entire Class and have fulfilled their obligations under Rule 23 of the Federal Rules of Civil Procedure.

2. The Lazy Oil Objectors cite to *In re Corn Derivatives Antitrust Litigation*, 748 F.2d 157, 162–166 (3d Cir.1984), *cert. denied sub nom. Cochrane & Bresnahan v. Plaintiff Class Representatives*, 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985), in support of their motion to disqualify counsel. Nothing in that decision requires our granting the motion to disqualify Class Counsel in this case. The Third Circuit in *In re Corn Derivatives* recognized that the rule prohibiting representation of interests adverse to a former client in the same (or substantially related) litigation has several purposes, which should be weighed against countervailing interests that may exist in the class context. 748 F.2d at 162.

3. The concurring opinion of Judge Adams in *In re Corn Derivatives* is instructive inasmuch as it recognizes that "courts cannot mechanically transpose to class actions the rules developed in the traditional lawyer-client setting context." 748 F.2d at 163. The obligation of class counsel runs to the class as a whole, although in general class counsel may have personally worked only with the named parties. *Id.* Conflicting interests among class members represented by a single attorney in a class action are frequently inevitable at some point during the litigation and most often arise over questions of relief. *Id.* Under a strict application of the ethical rules, an attorney representing discordant class members would be required to withdraw completely from the litigation whenever class members disagree about the propriety of a proposed settlement. "Although this may promote the salutary ends of confidentiality and loyalty, it would have a serious adverse effect on class actions." 748 F.2d at 164. Judge Adams further recognized that, "[i]f a class attorney is automatically prevented from continuing to represent ... a majority of a class which supports a settlement, the minority dissenting class members might obtain considerable leverage in the litigation by being able to force the majority to seek new counsel." *Id.* Thus, a rigid "prophylactic rule" in the area of client confidentiality in class actions would appear to be inappropriate. 748 F.2d at 165.

4. Instead, the appropriate process is one of balancing the costs to litigants and the class action device if disqualification occurs against the need to enforce the lawyer's duties of loyalty and confidentiality. 748 F.2d at 164. Here, the interests of the dissenting class members have been adequately protected by virtue of this Court's supervision of the class settlement process and our consideration of the fairness of the Settlement after exhaustive review of the record. In addition, Class Counsel have fulfilled their obligations to make known to the Court their potential conflict with the dissenting class representatives so that steps could be taken to adequately protect the dissenting members' interests. Thus, we perceive little prejudice, if any, to the Lazy Oil Objectors by virtue of Class Counsels' continued involvement in this case. More-

over, the Objectors have offered little evidence concerning the amount and nature of information proffered by them to Class Counsel, its availability elsewhere, its importance to the issue of class settlement, or the prejudice that they may suffer as a result of disclosing that information.

5. On the other hand, we perceive significant prejudice to the Class if counsel are disqualified at this late date. Class Counsel have acquired considerable knowledge and a thorough understanding of the complex issues of this litigation and are uniquely suited to proceed with representation of the Class. We consider it unlikely that the Class would be able to secure comparable counsel at this point in the proceedings. Therefore, the competing interests here weigh in favor of denying the Objectors' motion to disqualify Class Counsel.

6. The Lazy Oil objectors also rely on *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157 (5th Cir.1978), *reh'g en banc denied,* 581 F.2d 267 (5th Cir.1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979), as support for the removal of Class Counsel. In *Pettway,* the Fifth Circuit held that the class representatives should have been permitted to prosecute an appeal of a portion of the district court's decree concerning injunctive relief and denial of back pay, even though class counsel had advised against the appeal. *Id.* at 1178. The court ruled that the district court had abused its discretion in denying the appellants' motion to substitute class counsel for purposes of the appeal. *Id.* However, in *Pettway,* substitute class counsel were necessary to appeal the backpay and injunction issues. In the instant case, the rights of class members do not depend on the substitution of new class counsel. Class members have been provided the opportunity to object to this proposed Settlement. They may also appeal the Court's decision to approve the Settlement without a change in Class Counsel. Thus, *Pettway* is inapposite, and we are not persuaded that any aspect of

that decision requires substitution of counsel in this case.

7. The reliance by the Lazy Oil Objectors on *McMahon v. Shea,* 547 Pa. 124, 688 A.2d 1179 (1997) is also misplaced. *McMahon* involved a malpractice claim against an attorney who allegedly failed to advise a client about his obligations under an alimony agreement. In the instant case, the issue before the Court is whether the Settlement is reasonable under the *Girsh* factors. The Court concludes that it is. In addition, the class members here were advised of the consequences of the Settlement, including the fact that approval of the Settlement will result in a dismissal of the Class claims; thus, the facts here are not analogous to those in *McMahon.* Finally, as discussed above, the Court concludes that the price differential measure of damages used by Class Counsel was an appropriate method and cannot (for reasons previously stated) serve as a justification for disqualifying counsel.

8. For the reasons previously stated herein, the request of Lazy Oil to remove all other Class Counsel is similarly denied.

**B. THE ADEQUACY OF THE PENNZOIL AND WITCO SETTLEMENT**

 9. The settlement of disputed claims, especially of complex class action litigation, is favored by courts as a matter of public policy. *See, e.g., Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982), *cert. denied sub nom. Coyne v. Weinberger,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983), *and cert. denied sub nom. Lewy v. Weinberger,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir. 1977). This principle is well established in the Third Circuit. *See GM Trucks Litig.,* 55 F.3d at 784. *Eichenholtz v. Brennan,* 52 F.3d 478, 486 (3d Cir.1995); *In re Residential Doors Antitrust Litig.,* 1997–1 Trade Cases (CCH) ¶ 71,681 at 78,864, 1996 WL 751550 at *6 (E.D.Pa. Dec.31, 1996); *Ratner v. Bennett,* No. Civ. A. 92–

4701, 1996 WL 243645 at *4 (E.D.Pa. May 8, 1996).

10. The courts have long recognized that compromise is the essence of settlement. *See Isby v. Bayh,* 75 F.3d 1191, 1200 (7th Cir.1996) (citation omitted); *Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir.1984); *In re Chicken Antitrust Litig. American Poultry,* 669 F.2d 228, 238 (5th Cir.1982). Indeed, a "just result is often no more than an arbitrary point between competing notions of reasonableness." *In re Corrugated Container Antitrust Litig. (II),* 659 F.2d 1322, 1325 (5th Cir.1981), *cert. denied sub nom. CFS Continental, Inc. v. Adams Extract Co.,* 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982), and *cert. denied sub nom. Three J Farms, Inc. v. Adams Extract Co.,* 456 U.S. 1012, 102 S.Ct. 2308, 73 L.Ed.2d 1309 (1982). Not only does settlement conserve judicial resources, but the parties may gain significantly from avoiding the costs and risks of a lengthy and difficult trial. *See In re First Commodity Corp. of Boston Customer Accounts Litig.,* 119 F.R.D. 301, 307 (D.Mass.1987); *Florida Trailer & Equip. Co. v. Deal,* 284 F.2d 567, 571 (5th Cir.1960) ("the very uncertainties of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the ... power to compromise").

11. Class actions, with their notable uncertainties, difficulties of proof, and length, make application of this policy in favor of settlement particularly appropriate. *Cotton v. Hinton,* 559 F.2d at 1331; *In re Novacare Sec. Litig.,* [Current Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 98,930 at 93,498, 1995 WL 605533 at *3 (E.D.Pa. Oct.13, 1995) ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.") (quoting *GM Trucks Litig.,* 55 F.3d at 784).

12. Taking into account the strong public policy favoring settlement, trial courts are directed to approve class action settlements that are "fair, adequate, and reasonable." *Stoetzner v. U.S. Steel Corp.,* 897 F.2d 115, 118 (3d Cir.1990); *Walsh v. Great Atlantic & Pacific Tea Co., Inc.,* 726 F.2d 956, 965 (3d Cir.1983); *Eichenholtz v. Brennan,* 52 F.3d at 482. In making that determination, the trial courts have "wide discretion." *Shlensky v. Dorsey,* 574 F.2d 131, 147 (3d Cir.1978).

13. In the Third Circuit, the nine factors identified in *Girsh v. Jepson,* 521 F.2d 153, 156–57 (3d Cir.1975), outline the standard to be applied in determining whether a settlement should be approved as "fair, adequate, and reasonable." *GM Trucks Litig.,* 55 F.3d at 785–86, 804–806; *In re Chambers Development Sec. Litig.,* 912 F.Supp. 822, 836 (W.D.Pa.1995); *Sanders v. U.S. Dept. of Housing and Urban Development,* 872 F.Supp. 216, 220 (W.D.Pa.1994). These factors, as discussed in detail above, include (1) the complexity, expense and duration of the litigation; (2) the reaction of the class to settlement; (3) the stage of proceedings at which settlement is reached; (4) the risks of establishing liability at trial; (5) the risks of establishing damages; (6) the risks of maintaining the class throughout trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best possible recovery; and (9) the range of reasonableness of settlement in light of the attendant risks of litigation.

*1. The Complexity, Expense and Duration of the Litigation*

14. The complexity and duration of this lawsuit favors approval of the Pennzoil and Witco Settlement. As discussed above, this action, filed in the spring of 1994, involved massive discovery, including more than 80 depositions and the review and analysis of hundreds of thousands of documents. Both sides engaged multiple experts who prepared extensive reports. The discovery directed to the parties' experts included additional docu-

ment review and multi-day depositions. As a result, the resulting expert opinions were especially complex. The prosecution and defense of the action have resulted in the expenditure of many millions of dollars in attorneys' fees and expenses for both Plaintiffs and Defendants. Absent this Settlement, an enormous additional amount of time and expense would be devoted to additional expert discovery (assuming that the Court allowed the submission of some or all Plaintiffs' rebuttal reports), final trial preparation and trial of the case. Regardless of the verdict, the amounts and issues involved would make appeals inevitable and the ultimate duration of the litigation could reach five years or more.

15. The delay and uncertainty, as well as the mounting expense, of continued litigation are factors supporting settlement. *In re TSO Financial Litig.,* Civ. A. Nos. 87–7903, 87–7961, 87–8142 and 87–8302, 1989 WL 73249 at *5 (E.D.Pa. June 29, 1989). *See also TBK Partners, Ltd. v. Western Union Corp.,* 517 F.Supp. 380, 389 (S.D.N.Y.1981), *aff'd.* 675 F.2d 456 (2d Cir.1982); *Wellman v. Dickinson,* 497 F.Supp. 824, 830–31 (S.D.N.Y.1980), *aff'd by Jay–Gro Fabrics, Inc. Pension Trust v. Sun Co., Inc.,* 647 F.2d 161 (2d Cir.1981) (Table Case), and *aff'd by Rosenfeld v. Sun Co., Inc.,* 647 F.2d 162 (2d Cir.1981) (Table Case), and *aff'd. by Punko v. Dickinson,* 647 F.2d 162 (2d Cir.1981) (Table Case), and *aff'd by Polne v. Sun Co., Inc.,* 647 F.2d 162 (2d Cir.1981) (Table Case), and *aff'd by Wellman v. Dickinson,* 647 F.2d 163 (2d Cir.1981) (Table Case), and *judgment aff'd,* 682 F.2d 355 (2d Cir.1982), *cert. denied sub nom. Dickinson v. S.E.C.,* 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983). The Pennzoil and Witco Settlement would provide immediate and certain benefits to the Class and avoid years of delay and uncertainty. Without the Settlement, the parties face the likely prospect of expensive litigation for a protracted period of time. The complexity, expense, and duration of the litigation favor approval of the Settlement.

16. Counsel for both sides also support the Settlement. In considering a proposed settlement, the courts are entitled to rely upon the judgment of experienced counsel. The opinion and recommendation of experienced counsel are entitled to considerable weight. *Daniel B. v. O'Bannon,* 633 F.Supp. 919, 926 (E.D.Pa.1986); *Fisher Bros. v. Cambridge–Lee Indus., Inc.,* 630 F.Supp. 482, 488–89 (E.D.Pa.1985); *Feder v. Harrington,* 58 F.R.D. 171, 176 (S.D.N.Y.1972); *Cannon v. Texas Gulf Sulphur Co.,* 55 F.R.D. 308, 316 (S.D.N.Y. 1972); *Kirkorian v. Borelli,* 695 F.Supp. 446, 451 (N.D.Cal.1988). As the Manual for Complex Litigation makes clear: "In evaluating the settlement, the judge should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation." Manual for Complex Litigation § 30.42 (3d ed.1995).

17. While a trial court must make an independent evaluation, it should avoid substituting its judgment for that of the lawyers who negotiated the settlement. *See, e.g., Metropolitan Pittsburgh Crusade for Voters v. City of Pittsburgh,* 686 F.Supp. 97, 102 (W.D.Pa.1988) ("The professional judgment of Class Counsel is also entitled to significant weight."); *Sommers v. Abraham Lincoln Fed. Sav. & Loan Ass'n,* 79 F.R.D. 571, 576 (E.D.Pa.1978); *Fisher Bros. v. Cambridge–Lee Indus., Inc.,* 630 F.Supp. at 488–89. As the court explained in *Federman v. Empire Fire and Marine Ins. Co.,* [1975–76 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,418 at 99,114, 1976 WL 755 at *3 (S.D.N.Y. Jan.19, 1976):

> If there are issues of fact and questions of law which make any recovery problematical, the determination of what amount of money constitutes a fair settlement is not a matter of mathematical science. The court is in no position to substitute its judgment for that of honest and competent attorneys, who, after exhaustive discovery, have made a de-

termination that the settlement represents a fair and realistic appraisal of their clients' chances of ultimate success.

18. In evaluating the opinion of counsel, courts often consider the "negotiating process by which the settlement was reached" in evaluating a settlement. *Weinberger v. Kendrick,* 698 F.2d at 74. The settlement negotiations in this case were conducted at arm's-length by experienced counsel. The negotiations were protracted and difficult. On a number of occasions they came to a standstill, but were later revived. Under such circumstances, the Court can rely upon the judgment of counsel in evaluating the settlement. *West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710, 741, 743–44 (S.D.N.Y.1970), *aff'd,* 440 F.2d 1079 (2d Cir.1971), *cert. denied sub nom. Cotler*

*Drugs, Inc. v. Chas. Pfizer & Co., Inc.,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971).[27]

### 2. The Reaction of the Class to the Settlement

19. The reaction of class members to a proposed settlement is also a significant consideration. *See GM Trucks Litig.,* 55 F.3d at 812. When few class members object, after the dissemination of notice specifically advising them of the procedure for objecting to a proposed settlement, this is generally regarded as supportive of the settlement. As courts have recognized, "[I]n the class action context, silence may be construed as assent." *In re GNC Shareholder Litig.,* 668 F.Supp. 450, 451 (W.D.Pa.1987).[28] *See also Bell Atlantic*

**27.** While not determinative of the Court's conclusion that this settlement is fair, reasonable and adequate, the Court notes that it has reviewed the Affidavit of Arlin M. Adams concerning the fairness of the Settlement. Judge Adams believes that "the judgment of counsel should be respected." Adams Affidavit, ¶ 79.

**28.** The Court recognizes that, in *GM Trucks Litig.,* the Third Circuit advised that silence from class members may not necessarily demonstrate tacit consent or support for the proposed settlement. 55 F.3d at 812–13. Indeed, the court in *GM Trucks Litig.* found that, under the circumstances of that case, the reaction of class members was negative on the whole and weighed against approval of the class settlement. *Id.* The court noted, among other things, that the absent class members suing GM might have been discouraged from voicing any objection to the settlement due to a small financial stake in the litigation or a lack of appreciation of the size of their claims. Notably, the class in *GM Trucks* did not include individuals who had already experienced problems or mishaps related to the allegedly defective fuel tank design; therefore, the court reasoned, the class might include members who would have no reason (outside of media coverage) to know of the latent defect or the claim based on the alleged existence of the defect. The court also apparently found it significant that the notice of class action had been sent simultaneously with the notice of class settlement, thus possibly casting the appearance that the settlement was a 'fait accompli.' And specifically, the court observed that the class notices

lacked information concerning certain relief (i.e. a retrofit) that had been sought in the original complaint, and was in other respects arguably deficient. Additionally, the court found it instructive that many of the better informed absentee members did object, including fleet owners, some of whom owned as many as 1,000 trucks. A poll conducted by the Plaintiffs' marketing expert further evidenced a lack of support, inasmuch as it showed that some 63% of those members polled indicated that they would probably not or definitely not use the coupons which were part of the settlement to purchase a new GM truck. This, the court found, "also suggests that the class could not possibly have so wholeheartedly endorsed the settlement." 55 F.3d at 813. The court found that, despite the relatively low number of objectors in terms of absolute numbers, those objectors included fleet owners with a substantial financial incentive in the litigation, most of whom objected quite vociferously. Based on these circumstances, the court found that the reaction of the class was actually negative.

While we are mindful of the Third Circuit's admonition against construing "silent consent" too strongly, we note that many of the concerns present in the *GM Trucks Litig.* case are not present here. Most of the class members who have filed objections in this litigation are not significant producers in terms of quantity oil produced or sales generated. Indeed, Plaintiffs have presented evidence that some of the more sophisticated and/or prominent producers (who presumably have a larger financial stake in this litigation) support

*Corp. v. Bolger,* 2 F.3d 1304, 1313 n. 15 (3d Cir.1993) (noting that "silence constitutes tacit consent," but recognizing that this assumption may, as a practical matter, understate potential objectors); *Hammon v. Barry,* 752 F.Supp. 1087, 1092–93 (D.D.C. 1990) (class settlement approved where overwhelming majority of class did not object).[29]

20. The notice to class members describing the proposed Settlement and matters related to the Settlement was adequate and comported fully with the requirements of Rule 23(e) and due process. The notice fairly apprised class members of the Settlement and their rights. *See In re Painewebber Limited Partnerships Litig.,* 171 F.R.D. 104, 124 (S.D.N.Y.1997), *aff'd,* 117 F.3d 721 (2d Cir.1997). Thus, the Court is unpersuaded by the Objectors' claims that the settlement notice was so deficient as to compromise the fairness of the Settlement.

21. The fact that some class members object is neither uncommon nor fatal to settlement approval. In fact, numerous class settlements have been approved over objections from many class members. In affirming approval of a settlement, where 82 members of a class of 452 objected, the Third Circuit observed in *Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799, 803 (3d Cir.1974), *cert. denied sub nom. Abate v. Pittsburgh Plate Glass Co. (PPG Indus.,*

*Inc.),* 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974), *reh'g denied,* 420 U.S. 913, 95 S.Ct. 836, 42 L.Ed.2d 844 (1975), that a "settlement is not unfair or unreasonable simply because a large number of class members oppose it." Similarly, in *In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. 297, 326 (N.D.Ga.1993) the court recognized that a settlement can be fair notwithstanding a large number of objectors, citing *Cotton v. Hinton,* 559 F.2d at 1331. *See also, Reed v. Rhodes,* 869 F.Supp. 1274, 1281 (N.D.Ohio 1994) (a court should not withhold approval merely because some class members object to the agreement).

22. Moreover, numerous courts have approved class action settlements notwithstanding opposition by named class representatives. For example, in affirming the approval of a class settlement opposed by all but one of eleven named plaintiffs in *Parker v. Anderson,* 667 F.2d 1204, 1211 (5th Cir.1982), *reh'g denied,* 671 F.2d 1378 (5th Cir.1982), *cert. denied,* 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982), the Fifth Circuit observed:

> The courts have recognized that the duty owed by Class Counsel is to the entire class and is not dependent on the special desires of the named plaintiffs. It has been held that agreement of the named plaintiffs is not essential to ap-

the Settlement. Moreover, to the extent that the objectors point to alleged deficiencies in the class notice of settlement, we have found those deficiencies to be on the whole insubstantial and not likely to have significantly altered the Class's reaction. Also significant is the fact that here, unlike in *GM Trucks,* the notice of class action and notice of class settlement were not sent years apart. The settlement notice clearly advised members of their right to object and the manner in which they could go about registering their objections. The notice also clearly did not purport to the a complete summary of the litigation and referred class members to sources of additional information. In sum, we find the circumstances here to be sufficiently distinguishable from those in *GM Trucks* such that this Court is confident in concluding that the class reaction in this case favors approving the

Settlement. However, even if we were to conclude that the Class's reaction to Settlement was essentially negative, we would still be inclined to find that the *Girsh* factors, on the whole, favor approval of the Settlement.

**29.** The passages from *In Re General Motors Corp. Engine Interchange Litig.,* 594 F.2d 1106 (7th Cir.1979), *cert. denied sub nom. Oswald v. General Motors Corp.,* 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979), and *cert. denied sub nom. General Motors Corp. v. Oswald,* 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979), relied upon by the Lazy Oil Objectors are inapposite. Those passages at 594 F.2d at 1139–40 relate to the ability of the Defendant to settle individually with class members. Further, Class Counsel here were authorized under Pretrial Order No. 1 to conduct settlement negotiations.

proval of a settlement which the trial court finds to be fair and reasonable.

23. The Fourth Circuit, in affirming approval of a settlement to which three named plaintiffs objected in *Flinn v. FMC Corp.*, 528 F.2d 1169 (4th Cir.1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976), similarly noted:

> Appellants do not argue, nor may they under the authorities, that assent of the class plaintiffs is essential to the settlement, provided the trial court finds it fair and reasonable.

*Id.* at 1174 n. 19.

24. Approval of a class settlement was also affirmed, over the opposition of five of six named plaintiffs, in *Kincade v. General Tire and Rubber Co.*, 635 F.2d 501 (5th Cir.1981):

> Appellants' argument that the settlement cannot be applied to them because they did not authorize their attorney ... to settle the case or otherwise consent to the settlement is easily disposed of. Because the "client" in a class action consists of numerous unnamed class members as well as the class representatives, and because "(t)he class itself often speaks in several voices ..., it may be impossible for the class attorney to do more than act in what he believes to be the best interests of the class as a whole...." Because of the unique nature of the attorney-client relationship in a class action, the cases cited by appellants holding that an attorney cannot settle his individual client's case without the authorization of the client are simply inapplicable.

*Id.* at 508 (internal citation omitted).

25. In *Maywalt v. Parker & Parsley Petroleum Co.*, 864 F.Supp. 1422 (S.D.N.Y. 1994), *aff'd*, 67 F.3d 1072 (2d Cir.1995), the Court approved a class settlement despite objections by four of five class representatives and approximately 2,700 other class members (at least 3% of the class) and stated:

> To empower the Class Representatives with what would amount to an automatic veto over the Proposed Settlement does not appear to serve the best interests of Rule 23 and would merely encourage strategic behavior "designed to maximize the value of the veto rather than the settlement value of their claims."

*Id.* at 1430 (quoting *In re Ivan F. Boesky Sec. Litig.*, 948 F.2d 1358, 1366 (2d Cir. 1991)). Recently, in *In re Airline Ticket Comm'n Antitrust Litig.*, 953 F.Supp. 280, 282 n. 3 (D.Minn.1997), the Court approved the settlement despite the fact that one of the objectors was also a named class representative. The Court noted that it "consider[ed] [the representative's] objection, but accord[ed] it no special deference based merely on [his] status as a class representative." *See also Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 855 F.Supp. 825 (E.D.N.C.1994) (approving settlement where several members of the class, including a majority of the class representatives and named plaintiffs, filed objections); *Elliott v. Sperry Rand Corp.*, 680 F.2d 1225, 1226–27 (8th Cir.1982) (affirming approval of settlement where 790 members of class of 3,000 members, including both named plaintiffs, (approximately 26% of class) objected and about 30 testified in opposition); *Laskey v. International Union, Etc. (UAW)*, 638 F.2d 954, 957 (6th Cir.1981) (not abuse of discretion to accept settlement over named representatives' objections).

26. In the instant case, a very small group of producers has objected. The Court has carefully considered these objections, but finds their objections unpersuasive.

27. The primary thrust of the Lazy Oil Objectors' opposition to the Settlement is their belief that damages to the class members should take into account not just the differential between the conspiratorial and the competitive price but also lost profits resulting from these depressed prices. (*See* Objectors' Mem. in Opp. to Settlement Approval [Doc. No. 180] at pp.

6–11.) The objectors from New York also claim that the measure of damages should have included a lost profits component. (Mem. of Law Submitted by Eight Certain Class Members in Opp. to the Settlement [Doc. No. 201] at 6.)

28. The Court has not considered the illustrative model damage analysis of the Lazy Oil objectors because their counsel stated at the final hearing that he was not offering it into evidence and it was attached to a memorandum for illustrative purposes only. (Tr., Vol. III at 178–79.) It bears noting, however, that the Objectors' "illustrative" damages model—when its fundamental flaws are corrected—yields damages *below* those determined by Plaintiffs' expert, Dr. House. (*See* Affidavit of Dr. Kevin Neels, dated April 11, 1997 [Doc. No. 220].)[30] As described in the Neels Affidavit, Objectors' illustrative model double-counts the percentage underpayment damages caused by the alleged conspiracy. Thus, rather than present a picture that accurately sets forth damages, they have grossly overstated the damages even under a "lost profits" model. (*See* Neels Affidavit [Doc. 220].) In addition, the Objectors' illustrative model ignores market factors. Omitting these basic economic considerations results in the use of overly optimistic and unrealistic assumptions, thereby resulting in an inflated measure of damages. *Id.*

29. The lost profits theory of damages is not susceptible to common class-wide methods of proof, but instead requires thousands of mini-trials to determine the lost profits of each class member. The use of such a "lost profits" model requires individualized inquiry into each class member's access to sites for development of new wells, likely production rates and operating costs, drilling costs and lifting costs. The obvious need for the individu-

alized calculation of lost profits surely would have invited a motion for de-certification of the class. *See, e.g., White Indus., Inc. v. Cessna Aircraft Co.,* 845 F.2d 1497, 1502–03 (8th Cir.1988) (affirming de-certification of class after finding injury must be proved on an individual basis), *cert. denied,* 488 U.S. 856, 109 S.Ct. 146, 102 L.Ed.2d 118 (1988); *Franklin Container Corp. v. International Paper Co.,* 1983–2 Trade Cas. (CCH) ¶ 65,727, 1982 WL 1958 at *3–4 (E.D.Pa. May 12, 1982).

30. In order to make out a liability case in an antitrust case, a plaintiff must demonstrate that the defendants conspired and caused damage "in fact" to the plaintiff—i.e. impact. *Allen–Myland, Inc. v. International Business Machines Corp.,* 33 F.3d 194, 201 (3d Cir.1994), *cert. denied,* 513 U.S. 1066, 115 S.Ct. 684, 130 L.Ed.2d 615 (1994); *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 454 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). The Lazy Oil objectors are incorrect in claiming that the "fact of damages" is established merely by proving wrongdoing. In *Bogosian,* relied on by the Lazy Oil Objectors, the district court initially denied class certification on the ground, among others, that plaintiffs' damage theory would require a showing of lost profits. 561 F.2d at 456. The Third Circuit reversed and held that plaintiffs could prove damages on the basis of an illegal overcharge and thus overcome the individualized nature of proof found in the lost profits approach. *Id.* at 454–56.

31. In addition, to the extent that some producers drilled new wells and increased their production, those producers with new production closer to Defendants' refineries would likely be favored producers because of lower transportation costs. Thus, under the lost profits method, there would be an

---

**30.** Unlike Plaintiffs' damage model, which was prepared by experienced economists and tested by days of discovery and deposition by Defendants' counsel, it appears that the Objectors' illustrative model was prepared without expert assistance and it is unclear what

data formed the basis for the applicable assumptions. (*See* Objectors Memorandum [Doc. No. 180] at page 8 where the Objectors admit that their model must be "subjected to evidentiary scrutiny.")

intra-class conflict between producers in closer proximity to Defendants' refineries with those further away. In short, objectors' proposed methodology is not suitable for a class action. *See Franklin Container,* 1983–2 Trade Cas. (CCH) ¶ 65,727 at p. 69722–23, 1982 WL 1958 at *3–4.

32. The Lazy Oil Objectors and the New York Objectors also complain about the lack of prospective relief. Implicit in their argument is the argument that the Settlement is inadequate because it fails to guarantee that the prices paid by the Defendants to the class members in the future will be increased or returned to previous levels. Of course, any Settlement agreement that provided for agreed-upon future price increases would itself be a § 1 violation. Recently, in *In re Airline Ticket Comm'n Antitrust Litig.,* the court rejected an initial settlement with TWA that would have re-imposed a 10% commission rate for domestic airline tickets. The United States Department of Justice opposed the settlement on the grounds that such a settlement agreement would constitute illegal price fixing. As the court observed, "an illegal term would render a class action settlement invalid, 'no matter how much the parties, for whatever reason, wanted.'" 953 F.Supp. at 284 (quoting *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist.,* 921 F.2d 1371, 1384 (8th Cir.1990)).

33. We conclude, for the foregoing reasons, that the reaction of the Class on the whole is a factor which favors approval of the Settlement.

### 3. The Stage of the Proceedings and Amount of Discovery Completed

34. The Settlement with Pennzoil and Witco was reached after the completion of merits and expert discovery, subject to further rebuttal expert discovery. It cannot be criticized as being "too early." Counsel for both sides are fully informed of the strengths and weaknesses of their respective cases and the merits of the claims and defenses presented. Absent a full trial, they could not be in a better position to assess possible settlement terms. As the Third Circuit observed in *Bell Atlantic Corp. v. Bolger,* 2 F.3d at 1314, "post-discovery settlements are more likely to reflect the true value of the claim and be fair." Moreover, "a presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery." MANUAL FOR COMPLEX LITIGATION § 30.42 (3d ed. 1995) *Accord GM Trucks Litig.,* 55 F.3d at 813–14; *Wellman v. Dickinson,* 497 F.Supp. at 830; *Galdi Sec. Corp. v. Propp,* 87 F.R.D. 6, 10 (S.D.N.Y.1979).

35. Class counsel have undertaken an extensive investigation and discovery regarding the relevant facts. They have studied publicly-available information, interviewed witnesses, have reviewed and analyzed hundreds of thousands of pages of documents produced by Defendants, as well as documents produced by non-parties. They have consulted with experts on liability and damages issues. More than eighty depositions have been taken. The stage-of-the-proceedings factor strongly favors approval of this settlement. *Cf. GM Trucks Litig.,* 55 F.3d at 813–14 (settlement disapproved where, among other things, settlement was reached only four months after filing of complaint, with no significant independent discovery, no experts retained, and only a small number of depositions taken).

### 4. The Risks of Establishing Liability at Trial

36. Whenever a class settlement is presented for approval, the possibility exists that the settlement could be disapproved and the parties and their counsel could later find themselves locked in continuing litigation and a full-scale trial. Therefore, the courts have recognized that it is not realistic to expect counsel to highlight potential weaknesses or to emphasize any particularly vulnerable points in their case.

Still, no outcome is guaranteed, and there are risks that can be identified.

37. Here, as in every case, Plaintiffs face the general risk that they may lose at trial, since no one can predict the way in which a jury will resolve disputed issues. As one court has noted, "no matter how confident one may be of the outcome of litigation, such confidence is often misplaced." *West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. at 743–44 (citing cases in which settlements were disapproved and plaintiffs subsequently lost at trial). *Accord GM Trucks Litig.*, 55 F.3d at 814 ("By evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downsides) of litigation might have been had class counsel elected to litigate the claims rather than settle them."); *In re Baldwin–United Corp.*, 105 F.R.D. 475, 482 (S.D.N.Y.1984) (comparing advantages of immediate cash payments with risks involved in long and uncertain litigation).

38. As in most price-fixing cases, the Defendants have not admitted that they fixed prices, and discovery has not unearthed direct evidence of an agreement to do so. Although this is not unusual in an antitrust conspiracy case, which typically involves reliance on circumstantial evidence, it means that the outcome of trial would be determined by the jury's view of the evidence as a whole, with any finding of conspiracy dependent upon inferences from the collective circumstantial evidence. There are, of course, both strong and weak circumstantial evidence cases. *See Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.*, 998 F.2d 1224, 1232–33 (3d Cir.1993), *cert. denied sub nom. Moyer Packing Co. v. Petruzzi's IGA Supermarkets, Inc.*, 510 U.S. 994, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993).

39. It is impossible to predict with certainty how Plaintiffs' and Defendants' theories would fare at trial. However, the difficulty that would be confronted in establishing liability cannot be ignored in assessing the fairness of the Settlement.

No matter how well Plaintiffs' counsel presented the case, a favorable liability verdict cannot be assured. Moreover, a favorable judgment would be the subject of post-trial motions and appeals that could leave the ultimate liability determination unresolved for years. Further, even if Plaintiffs prevailed on all appeals, any award to the Class would be delayed and significant additional expenses would be incurred. *See e.g., Bullock v. Administrator of Estate of Kircher*, 84 F.R.D. 1, 10 (D.N.J.1979) (assessing expense of litigation, likelihood of appeal, risk of going to trial and prolonged duration of lawsuit as factors weighing in favor of settlement); *In re Baldwin–United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 607 F.Supp. 1312, 1327 (S.D.N.Y.1985).

### 5. *The Risks of Establishing Damages*

40. Plaintiffs and the Class also would face significant risks in establishing damages, should this action proceed to trial. The battle between Plaintiffs' and Defendants' experts would involve sophisticated analyses that might simply be rejected by a jury as speculative or unreliable. *See, e.g., United States v. 412.93 Acres of Land*, 455 F.2d 1242, 1247 (3d Cir.1972) ("The jury ... is under no obligation to accept as completely true the testimony of any expert witness. It may adopt as much of the testimony as appears sound, reject all of it, or adopt all of it."). The courts have recognized the need for compromise where divergent testimony would render the litigation an expensive and complicated "battle of experts." *See generally In re Warner Communications*, 618 F.Supp. at 744–45; *In re New Mexico Natural Gas Antitrust Litig.*, 607 F.Supp. 1491, 1505 (D.Colo.1984). Settlement of the litigation would eliminate the substantial risks posed by these damages issues.

41. The Court has read the expert reports submitted by the parties. The various expert opinions have also been addressed in hearings before the Court. The Court concludes that, notwithstanding the

reasonableness of choosing a price differential approach to damages, the risks of establishing all or some of the damages claimed by Plaintiffs was significant. This factor deserves particular weight in assessing the fairness of this settlement.

42. The significant risks surrounding proof of damages, and the uncertainty as to whether the Court or a jury would accept Plaintiffs' damages calculations, thus supports the settlement. *See generally Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

### 6. The Risks of Maintaining the Class Action Throughout Trial

43. The Defendants in this case did not oppose Plaintiffs' motion for class certification, and the Court agreed with Plaintiffs' view that the case met the criteria for class certification under Fed.R.Civ.P. 23(a) and (b)(3). In any class action, unforeseen developments affecting class certification can occur in the course of final pretrial preparation and trial. *See Eggleston v. Chicago Journeymen Plumbers Local Union No. 130, U.A.*, 657 F.2d 890, 896 (7th Cir.1981) ("a favorable class determination by the court is not cast in stone"), *cert. denied by Chicago Journeymen Plumbers' Local Union No. 130, U.A. v. Plummer*, 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982), and *cert. denied by Joint Apprenticeship Committee Local No. 130, U.A. v. Eggleston*, 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982), and *cert. denied by Plumbing Contractors Ass'n of Chicago & Cook County v. Plummer*, 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982). However, absent adoption of the damage methodology or subclass proposed by the Objectors, there does not appear to be a substantial risk that the Class in this case would be decertified, and the question of continued treatment of the case as a class action does not appear to be a major settlement consideration. Nevertheless, the Settlement would avoid any possible risk that class certification might not be maintained through trial and appeals.

### 7. The Ability of Defendants to Withstand a Greater Judgment

44. A defendant's ability to withstand a judgment greater than the settlement amount is relevant in cases where the Defendant's ability to pay a fair recovery is called into question by its precarious financial condition. *In re Chambers Development Sec. Litig.*, 912 F.Supp. at 839. While a judgment in favor of the Class in this case based on the full amount of damages sought would have a significant impact on the Defendants, this is not a "hardship settlement." The ability of Pennzoil and Witco to withstand a greater judgment is not a significant consideration with regard to this Settlement.

### 8. The Range of Reasonableness of the Settlement in Light of the Best Recovery and Attendant Risks of Litigation

45. There is a "range of reasonableness with respect to a settlement" that recognizes the uncertainties of law and fact in the particular case and the risks and costs inherent in litigating to the end. *See Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972), *cert. denied sub nom. Benson v. Newman*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972). In assessing the Pennzoil and Witco Settlement, the Court must determine whether the recovery falls within that range of reasonableness, "not whether it is the most favorable possible result of litigation." *Fisher Bros. v. Cambridge–Lee Indus., Inc.*, 630 F.Supp. at 489. *See also Davies v. Continental Bank*, 122 F.R.D. 475, 480 (E.D.Pa.1988). As the Fifth Circuit has explained in a frequently-quoted passage:

> [It should not] be forgotten that compromise is the essence of a settlement. The trial court should not make a proponent of a proposed settlement "justify each term of settlement against a hypothetical or speculative measure of what

concessions might have been gained; inherent in compromise is a yielding of absolutes and abandoning of highest hopes."

*Cotton v. Hinton,* 559 F.2d at 1330 (citation omitted).

46. The settlement amount here represents a percentage of Plaintiffs' experts' damages estimates that is well within the range typically approved by courts in passing on reasonableness. *See e.g., Erie Forge and Steel, Inc. v. Cyprus Minerals Co.,* Civil No. 94–404 (W.D.Pa. Dec.23, 1996) (approving settlement of $3.6 million where plaintiffs' expert estimated damages at $33 million); *Fox v. Integra Financial Corp.,* Civil Action No. 90–1504 (W.D.Pa. July 9, 1996) (approving settlement of $6.5 million where plaintiffs' best estimate of provable damages was $33 million); *In re Four Seasons Sec. Litig.,* 58 F.R.D. 19, 36–37 (W.D.Okla.1972) ($8 million settlement approved, although claims exceeded $100 million); *Cagan v. Anchor Sav. Bank FSB,* [1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,324 at 96,559, 1990 WL 73423 at *12–13 (E.D.N.Y. May 22, 1990) (approving $2.3 million class settlement over objections that "best possible recovery would be approximately $121 million"); *Behrens v. Wometco Enterprises, Inc.,* 118 F.R.D. 534, 542 (S.D.Fla.1988) ("The mere fact that the proposed settlement of $.20 a share is a small fraction of the desired recovery of $3.50 a share is not indicative of an inadequate compromise."), *aff'd* 899 F.2d 21 (11th Cir.1990).

47. In light of the well-recognized risks faced by litigants in proving liability and damages in cases of this type, courts have determined that a settlement can be approved even if benefits amount to a small percentage of the recovery sought. In *Detroit v. Grinnell Corp.,* 495 F.2d 448, 455 (2d Cir.1974), *impliedly overrruled in non-relevant part by Missouri v. Jenkins,* 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989), the Second Circuit stated: "The fact that a proposed settlement may only amount to a fraction of the potential

recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." And, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." 495 F.2d at 455 n. 2.

48. Consequently, class settlements involving far smaller percentage recoveries have been approved. *See e.g., Weinberger v. Kendrick,* 698 F.2d at 65 ($2.84 million settlement upheld which, because of legal difficulties, amounted to "only a negligible percentage of the losses suffered by the class," which were estimated at between $250 million and $1 billion); *Fisher Bros., Inc. v. Mueller Brass Co.,* 630 F.Supp. 493, 499 (E.D.Pa.1985) (approving settlement of 0.2% of sales); *Behrens v. Wometco Enterprises, Inc.,* 118 F.R.D. at 542 (settlement of 5.7% of total damages); *Cagan v. Anchor Savings Bank FSB, supra* (settlement of $2.3 million where estimated damages were $121 million); *Mersay v. First Republic Corp. Of America,* [1967–1969 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 92,304 at 97,443 (S.D.N.Y.1968) (5 to 10%); *In re Four Seasons Sec. Litig.,* 58 F.R.D. at 36–37 (settlement of less than 8% estimated damages); *Bagel Inn, Inc. v. All Star Dairies,* 1982–1 Trade Cases (CCH) ¶ 64,512, 1981 WL 2185 at *3 (D.N.J.1981) (settlement of 8% of potential damages); *Feder v. Harrington,* 58 F.R.D. 171, 176 (S.D.N.Y.1972) (Court approved settlement of 16% of "realistic damages").

49. As discussed above, the Plaintiffs in this case bear significant risks in seeking to establish liability and damages and in prevailing on all issues essential to a fully-litigated recovery. In weighing their prospects for success in the action, the Court need not, and should not, engage in a trial of the merits. *Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d at 804. The very purpose of a settlement is to avoid the trial of disputed issues. *Newman v. Stein,* 464 F.2d at 692. As expressed by one court,

[T]he Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere probability of relief in the future, after protracted and expensive litigation. In this respect, "it has been held proper to take the bird in the hand instead of a prospective flock in the bush."

*In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. at 326 (citing *Oppenlander v. Standard Oil Co.*, 64 F.R.D. 597, 624 (D.Colo.1974)).

50. The range-of-reasonableness factor clearly supports approval of the Settlement. The Pennzoil and Witco Settlement is fair, reasonable, and adequate, and is in the best interests of the Class. The Settlement is granted final approval.

C. CLASS COUNSELS' APPLICATION FOR AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES & THE OBJECTORS' REQUEST FOR AN INCENTIVE AWARD

1. *Counsels' Request for an Award of Attorneys' Fees*

■ 51. Attorneys who represent a class, and achieve a benefit for the class members, are entitled to be reasonably compensated for their services. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). *Accord GM Trucks Litig.*, 55 F.3d at 820 n. 39. As explained by the Third Circuit in *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 165 (3d Cir.1973) ("*Lindy I*"):

The award of fees under the equitable fund doctrine is analogous to an action in quantum merit: the individual seeking compensation has, by his actions, benefited another and seeks payment for the value of the service performed.

*Accord Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 110 (3d Cir.1976) ("*Lindy II* ").

52. A district court must thoroughly review a fee application in any class action settlement. *GM Trucks Litig.*, 55 F.3d at 819. Such close judicial scrutiny is necessary because of the "danger ... that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment for fees." *Id.* at 820 (quoting *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir.1991)).

■ 53. Application of the common fund doctrine is appropriate where, as here, the Settlement agreements release Defendants from potential liability for statutory attorneys' fees or specifically provide that all attorneys' fees shall be paid from the Settlement fund. *See* ¶ 6 of the Pennzoil/Witco Agreement of Settlement; ¶ 6 of the Quaker State Settlement. "[W]hen a settlement fund is created in exchange for release of the defendant's liability both for damages and for statutory attorneys' fees, equitable fund principles must govern the court's award of attorneys' fees." *Skelton v. General Motors Corp.*, 860 F.2d 250, 256 (7th Cir.1988), *cert. denied*, 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989). *See also City of Detroit v. Grinnell Corp.*, 495 F.2d at 468–69 (applying common fund principles to determine attorneys' fees in an antitrust class action, since the Clayton Act does not authorize attorney fees to a plaintiff who settles his claim with the defendant) (citations omitted); *McLendon v. Continental Group, Inc.*, 872 F.Supp. 142, 156 (D.N.J.1994) (finding that when settlement occurs, a fee-shifting case becomes a common fund case because the right for reasonable attorneys' fees had been extinguished).

54. Courts generally employ two complementary approaches in awarding reasonable attorneys' fees in a common fund case. *See Report of the Third Circuit Task Force*, "Court Awarded Attorneys' Fees," 108 F.R.D. 237, 250–53 (1985) ("Task Force Report"). One approach is the percentage of recovery method. Under this approach, the district court awards a percentage of the fund created

by the attorneys' efforts as the reasonable attorneys' fee. The other approach, the lodestar method, calculates fees by multiplying the number of hours the attorney expended by some hourly rate appropriate for the region and for the experience of the lawyer. *GM Trucks Litig.*, 55 F.3d at 819–20, n. 37, 38 and 39. The underlying purpose of both methods is to award a fee which is fair and reasonable.

55. In determining a fee award, the Court must first establish the type of action it is adjudicating and then primarily rely on the corresponding method of awarding fees. *GM Trucks*, 55 F.3d at 821. The Third Circuit has instructed that, while either the lodestar or percentage-of-recovery method should ordinarily serve as the primary basis for determining the fee, it is sensible to use the alternative method as a means of cross-checking the reasonableness of the fee. *Id.* at 820–21.

56. The Third Circuit has expressed a preference for use of the percentage-of-recovery method in common fund cases, although the ultimate choice of methodology rests within the trial court's discretion. *GM Trucks Litig.*, 55 F.3d at 821. The percentage-of-recovery method is used in common fund cases on the theory that the class would be unjustly enriched if it did not compensate counsels' work in generating the fund. *Id.* (citing *Task Force*, 108 F.R.D. at 250); *In re Prudential Ins. Co. of America Sales Practices Litig.*, 962 F.Supp. 572, 579 (D.N.J.1997). The Third Circuit has explained that "because [common fund] cases are not presumed to serve the public interest (as evidenced by the lack of a fee statute), there is no social policy reason that demands an adequate fee. Instead, the court apportions the fund between the class and its counsel in a manner that rewards counsel for success and penalizes it for failure." *GM Trucks*, 55 F.3d at 821.

57. Class Counsels' request for fees in this case is appropriately analyzed under the percentage-of-recovery approach. *See Local 56, United Food and Commercial Workers Union v. Campbell Soup Co.*, 954 F.Supp. 1000, 1004 (D.N.J.1997) ("Although the claims in the underlying class action were brought under ERISA, which contains a fee-shifting provision, the fact that the settlement creates a fund that buys benefits for class members and provides a sum certain from which the fee award is to be paid counsels the court to apply 'common fund' principles and the percentage-of-recovery method.")

58. The amount of attorneys' fees or expenses that should be awarded is a matter within the trial court's sound discretion and depends primarily upon the facts of each particular case. *In re Prudential Ins. Co.*, 962 F.Supp. at 578 (citing *GM Trucks Litig.*, 55 F.3d at 783, 821).

59. There is no consensus on how to determine a reasonable percentage. *In re Prudential Ins. Co.*, 962 F.Supp. at 580; *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 886 F.Supp. 445, 460 (E.D.Pa.1995). However, several courts in this circuit have observed that fee awards under the percentage-of-recovery approach typically range from 19% to 45% of the settlement fund, with 25% being the median award. *See Seidman v. American Mobile Sys.*, 965 F.Supp. 612, 622 (E.D.Pa. 1997) ("Although no general rule exists as to what is a reasonable percentage, courts have found that an award of 25% of the common fund is ordinarily reasonable."); *Hanrahan v. Britt*, 174 F.R.D. 356, 368 (E.D.Pa.1997) (noting that median award of counsel fees in a class action is approximately 25%); *Lachance v. Harrington*, 965 F.Supp. 630, 648–49 (E.D.Pa.1997) (awarding fee in amount of 30% net settlement fund consisting of approximately $1.15 million gross settlement fund, less expenses; court noted that, if it were awarding attorney fees based on the gross settlement fund, it would be more inclined to consider an award of 25% of the gross recovery); *Pozzi v. Smith*, 952 F.Supp. 218, 225 (E.D.Pa.1997) (adopting 25% as benchmark for attorney fees); *Unisys*, 886 F.Supp. at 461–62 (citing cases and author-

ities referring to "typical" percentages or ranges of percentages awarded as attorneys' fees: *viz,* 20–30%, 19–45%, 25%, 15–30%, 20–50%, 30% and 20–35%); *In re Greenwich Pharmaceutical Sec. Litig.,* Fed. Sec. L. Rep. (CCH) ¶ 98,744, 1995 WL 251293 at *6–7 (E.D.Pa.1995) (awarding fee of 33.3% and noting that median award is about 25%); *In re SmithKline Beckman Corp. Sec. Litig.,* 751 F.Supp. 525, 533 (E.D.Pa.1990) (noting range of fees from 19–45%, with benchmark being 25%). *Accord In re Pacific Enterprises Sec. Lit.,* 47 F.3d 373, 379 (9th Cir.1995) (concluding that the appropriate benchmark that district courts should use for attorneys' fee awards in common fund cases is 25% of the amount of the fund); 3 H. Newberg, *Newberg on Class Actions* (3d ed.1992) at § 14.03, p. 14–13 to 14–14 (normal range of common fund fee awards is 20–30%).

60. In this case, an award of attorneys' fees in the amount of 25% of the settlement fund is appropriate as an initial benchmark figure.

■ 61. In general, to avoid awarding windfalls, the percentage of recovery fee decreases as the size of the fund increases. Thus, the percentage of recovery awarded to counsel is normally inversely proportionate to the size of the recovery for the Class. *Task Force,* 108 F.R.D. at 256; *In re Residential Doors Antitrust Litigation,* 1997–1 Trade Cases (CCH) ¶ 71,681, 1996 WL 751550 at *10 (E.D.Pa. Dec.31, 1996); *see In re SmithKline Beckman Corp. Sec. Litig.,* 751 F.Supp. at 533.

62. At least one court has noted that "in situations involving funds comparable in magnitude to the one extracted here [to wit: $22 million plus interest], courts have awarded percentage of recovery fees comprising 20 to 27% of the fund." *In re SmithKline Beckman Corp. Sec. Litig.,* 751 F.Supp. at 534 (awarding fees in the amount of 25% of total settlement fund (including interest) in the amount of $22,769,000) (citing *In re Thortec Int'l Sec. Litig.,* Civ. No. 88–2470 (N.D.Cal. Aug. 15,

1989) (25% fee from recovery of $19.3 million); *In re Union Carbide Corp. Consumer Prod. Business Sec. Litig.,* 724 F.Supp. 160, 170 (S.D.N.Y.1989) (27% fee awarded from recovery of $20.2 million); *In re Warner Communications Sec. Litig.,* 618 F.Supp. at 748 (25% fee from recovery of $18.6 million); *In re Pepsico Sec. Litig.,* Civ. No. 82–8403, 1985 WL 44682 (S.D.N.Y. April 26, 1985) (20% fee from recovery of $21.5 million); *Philadelphia Elec. Co. v. Anaconda Amer. Brass Co.,* 47 F.R.D. 557, 559 (E.D.Pa.1969) (25% fee from recovery of $22.175 million)). *See also J/H Real Estate, Inc. v. Abramson,* 951 F.Supp. 63, 64–65 (E.D.Pa.1996) (declining requested fee award of 32% and instead awarding attorneys' fees of 25% of settlement fund where fund totaled $22 million). *Cf. In re Residential Doors Antitrust Litigation, supra* at *10 (30% fee award out of $14.55 million settlement).

63. Class Counsel have provided many case citations to class action suits in the Western District of Pennsylvania wherein the court made comparable awards in the range of 30% to 33 and ⅓ %. Counsel have also provided citations to many reported decisions in other judicial districts where attorney fees awards ranged from 30–43%. It would appear, however, that these cases generally involved settlement funds considerably smaller than the one at issue here. *See, e.g., Erie Forge and Steel, Inc. v. Cyprus Minerals Co.,* Civ. Action No. 94–404 (W.D.Pa.1996) (33.3% fee from $3.6 million recovery); *Fox v. Integra Financial Corp.,* Civ. Action No. 90–1504 (W.D.Pa.1996) (33.3% award where class recovery was $6.5 million); *Ratner v. Bennett,* Fed. Sec. L. Rep. (CCH) ¶ 99,225, 1996 WL 243645 at *9 (approving fee award in the amount of 35% of $400,000 settlement fund); *In re Greenwich Pharmaceutical Sec. Litig.,* 1995 WL 251293 at *6–7 (approving 33.3% fee where settlement fund was $4.375 million); *In re Fiddler's Woods Bondholders Litig.,* [1987–1988 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 93, 537, 1987 WL 19239 at *1–3

(E.D.Pa. Oct.28, 1987) (32.8% awarded out of $6.477 million settlement fund); *AAMCO Automatic Transmissions, Inc. v. Tayloe,* 82 F.R.D. 405 (E.D.Pa.1979) (43.87% fee awarded, $100,000 of which was to come from $1.2 million settlement fund, the rest being paid directly by defendant); *In re Magic Marker Sec. Litig.,* [1979–1980 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 97,116, 1979 WL 1248 (E.D.Pa. Sept.16, 1979) (where settlement fund, including anticipated interest, totaled $1.214 million, court awarded attorneys' fees of approximately 30% of that total); *Baron v. Commercial & Indus. Bank of Memphis,* [1979–1980 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 97,132, 1979 WL 1252 (S.D.N.Y.1979) (where gross amount of settlement fund was $900,000, approved attorneys' fees constituted approximately 29% and combined fees and expenses totaled approximately 36% of fund).

64. It is appropriate to consider other factors besides simply the size of the recovery. As one court has noted, courts have been guided by a variety of factors in determining a reasonable percentage of recovery in a given case. *In re Prudential Ins. Co.,* 962 F.Supp. at 580. Among the factors considered are: the amount of the class recovery, the quality of class counsel's service (including the quality of the result achieved in light of the difficulties faced, the speed and efficiency of the recovery achieved, class counsel's standing, experience, skill, and professionalism, and the quality and performance of opposing counsel), the percentage that might have been negotiated as a private contingent fee arrangement, the range within which attorneys' fees usually fall, the stage of the litigation at which the settlement was obtained, the novelty of the issues, and the factors unique to the particular case *See generally, Id.* at 580–81 (citing cases); *Petruzzi's, Inc. v. Darling–Delaware Co., Inc.,* No. Civ. A. 86–0386, 983 F.Supp. 595, 1996 WL 914131 at *6 (M.D.Pa. Nov.8, 1996), *reconsideration denied,*983 F.Supp.2d 595 (M.D.Pa. 1997); *In re Uni-*

*sys Corp.,* 886 F.Supp. at 457, 461 n. 32. However, these factors are not exhaustive, and the appropriateness of a requested fee award depends on the particular facts of each case. *In re Prudential Ins. Co.,* 962 F.Supp. at 581.

65. Based on the Court's evaluation of the relevant factors, as set forth above in the Court's findings of fact, *supra,* we conclude that a fee award of 28% is fair and appropriate here. Furthermore, as explained above in the Court's findings of fact, the reasonableness of this award is confirmed by cross-checking it against a lodestar approach.

66. Objections to Class Counsel's application for attorneys' fees were filed only by a small handful of class members: including certain of the West Virginia producers, eight New York producers, Belden & Blake Corporation, and individuals Barry Lay, Denny Harton and Richard Fry.

67. The primary thrust of the objection by the West Virginia producers is that if Class Counsel is awarded their requested counsel fees, "the attorneys for the Plaintiffs will receive a greater benefit than their clients." (Mem. in Supp. of West Virginia Producers' Objection to Settlement of Class Action [Doc. No. 199] at 10.) However, inasmuch as the Settlement Fund is being divided by thousands of class members, one cannot fairly assess the reasonableness of the attorneys' fee request simply by comparison to the recovery individual class members. Indeed, this very same objection was recently considered and rejected by the Court in *In re Airline Ticket Commission Antitrust Litig.,* 953 F.Supp. at 286:

Several objectors complain the attorneys will receive more from the Settlement than will any individual class member, but this observation does not cut against payment of the lawyers' fees. This class consists of approximately 34,000 members and virtually any number divided by 34,000 will appear to be small.... The Court notes that in the absence of

vigorous and competent Class Counsel, there would be no recovery for the plaintiffs at all.

Similarly, there would be no recovery here but for the efforts of Class Counsel.

68. The West Virginia objectors and Belden & Blake also contend that the Settlement only constitutes a very small portion of the estimated damages as calculated by Dr. House, and the Settlement amount "will be further reduced if the anticipated request for attorneys' fees and expenses is granted." (Mem. of West Virginia Producers [Doc. No. 199] at 9; Response of Belden & Blake to Application for Award of Attorney's Fees [Doc. No. 235] at 2.)

69. Belden & Blake also contend that Class Counsels' fee should be further reduced because they avoided the risks of trial by entering into Settlements. Long before Plaintiffs were faced with the uncertainties and risk of trial, Class Counsel undertook substantial risk by initiating and prosecuting this lawsuit on a wholly contingent basis. They invested thousands of hours and over $2 million of their own money in pursuing this case, and there was no assurance that any recovery, by trial or Settlement, would ever be forthcoming. As recognized by Arlin Adams in his Affidavit, lawyers who are paid on an hourly basis do not undertake such risks. (Aff. of Arlin M. Adams in Support of Application of Counsel Fees [Doc. No. 240] at ¶ 27). Thus, it is appropriate that the fee award here reflects adequate compensation for the fact that Class Counsel took on a very complex and expensive case at their own risk for the benefit of the Class. Third Circuit decisions have repeatedly stressed that it is important to adequately compensate counsel for the risks that they have undertaken and the benefits they have conferred on the Class.

70. The decision to settle this case rather than proceed to trial was a responsible decision that led to the creation of a substantial settlement fund for the benefit of the Class. The decision to settle avoided an expensive and protracted trial where the Class faced the substantial risk of failing to establish liability and also faced the substantial risk that, even if liability was proven, the damages awarded might be insignificant, if the Defendants' experts' theories were accepted at trial. The decision to settle also avoided the risk of lengthy appeals, and gave a substantial recovery to class members much faster than would otherwise have been possible through continued litigation.

### 2. The Request for Reimbursement of Expenses

71. Class Counsel also seek reimbursement of $486,165.00 in out-of-pocket expenses they incurred in connection with this litigation.[31] A schedule of the total disbursements of these expenses from the Joint Litigation Fund is described in the Affidavit of Howard J. Sedran. The nonlitigation disbursements of each applicant are set forth in the separate Affidavits of counsel. The individual firm disbursements principally include individual firm copying expenses, travel and lodging expenses, telephone and telecopy expenses and other litigation expenses. These expenses were reasonable and necessary to obtain the excellent settlements reached in this litigation.

72. Reimbursement of expenses to counsel who create a common fund is appropriate. See Ratner v. Bennett, 1996 WL 243645 at *10; In re Greenwich Pharmaceutical Sec. Litig., 1995 WL 251293 at *7; In re SmithKline Beckman Corp. Securities Litigation, 751 F.Supp. at 534; In re General Public Utilities Securities Litigation, [1983–84 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 99,566 at 97,234,

---

31. The Affidavit of Howard J. Sedran, dated April 9, 1997, reflects a credit to the Settlement Fund in the amount of $39,698.46 to account for the Quaker State Settlement expenses.

1983 WL 22362 at *13 (D.N.J. Nov.16, 1983). In light of the nature of this litigation, the expenses incurred by Counsel were reasonable and related to the interests of the Class and should be reimbursed.[32]

### 3. The Named Representatives' Request for an Incentive Award

73. As set forth in the Notice to the Class, incentive awards are requested for the Plaintiffs. Based upon the authorities discussed below, the following awards are made: (1) Wynnewood Drilling—$5,000; (2) Thomas A. Miller Oil Co. $5,000; (3) John Andreassi—$5,000; and (4) Lazy Oil Co.—$20,000.

74. The requests by Lazy Oil, Thomas A. Miller Oil Co. and John B. Andreassi for awards of $100,000.00 each are denied as excessive.

75. The Court's review of the case law indicates that other courts in this circuit have typically approved awards to class representatives in the range of $1,000 to $5,000. *See, e.g., Lachance v. Harrington,* 965 F.Supp. at 652 (incentive awards of $1,000 given to each of named representatives); *J/H Real Estate, Inc. v. Abramson,* 951 F.Supp. at 66 (awarding $1,000 to each named plaintiff); *Lake v. First Nationwide Bank,* 900 F.Supp. 726, 736–37 (E.D.Pa.1995) (awarding class representa-

tives $250 each as compensation for actual time and expenses incurred); *In re Chambers Development Sec. Litig.,* 912 F.Supp. at 863 (awarding incentive awards of $2,500 to each class representative); *In re Greenwich Pharmaceutical Sec. Litig.,* Fed. Sec. L. Rep. ¶ 98,744, 1995 WL 251293 at *8 (awarding $5,000 each to class representatives); *In re SmithKline Beckman Corp. Sec. Litig.,* 751 F.Supp. at 535 (incentive awards of $5,000 given to each of named class representatives); *In re GNC Shareholder Litig.,* 668 F.Supp. at 451 (incentive award of $3,000 to each named plaintiff).

76. The services and contributions to the Class's case made by Plaintiffs Thomas A. Miller Oil Co. and John B. Andreassi do not merit an award beyond the benchmark range typically awarded in this and other circuits. The Court concludes that an incentive award of $5,000 each to Thomas A. Miller Co. and John B. Andreassi is fair, reasonable and appropriate.

77. Lazy Oil Company, through Benny Landers, has provided a more valuable contribution to the Class's case; however, his contribution does not merit an award of $100,000. Instead, the Court concludes that an incentive award of $20,000 to Lazy Oil Company is fair, reasonable and appropriate.

---

**32.** The Court's fee award of $5,341,000 and expenses in the amount of $486,165.00 represents approximately 30.5% of the total settlement, including interest (and not including the $250,000 to be set aside for settlement administration). Taking into consideration the Court's previous interim award of expenses, this total represents approximately 40% percent of the $18.9 million Settlement Fund, plus interest. Many courts have awarded aggregated fees and expenses representing a similar percentage of a common fund in complex cases like this one. *Erie Forge and Steel, Inc. v. Cyprus Minerals Co., et al.,* Civil Action No. 94–404 (W.D.Pa.1996)(aggregate fees and expenses represented at least 45.8% of settlement fund.). *See In re Roster Ops Corp. Securities Litigation,* Nos. 92–20349 and 93–20115 (N.D.Cal., Aug., 1995) ($6,500,000 settle-

ment)(44.7%); *Friedman v. Lansdale,* No. 92–7257 (E.D.Pa., May, 1994) 1995 Fed.Sec. L.Rep. (CCH) ¶ 98,676 (E.D.Pa.)($200,000 settlement fund)(48.6%); *Pearl v. Bank of N.T. Butterfield,* No. 947827 (Cal.Super. Ct., San Fran. Co., Mar., 1994) ($8,000,000 settlement fund)(45.3%); *In re Control Data Corp. Securities Litigation,* Nos. 3–85–1341 and 3–85–1269 (D.Minn., Sept., 1994)($8,000,000 settlement fund)(50.9%); *In re Xytronyx Securities Litigation,* No. 92–194 (S.D.Cal., June, 1994) ($3,500,000 settlement fund)(42.6%); *In re Heart Technology Securities Litigation,* No. 92–986 Z (W.D.Wash., Sept., 1994) ($3,500,-000 settlement fund)(42.9%); *Urbach v. Sayles,* No. 91–1291 (D.N.J.) (April, 1995), ($1,250,000 settlement fund) (43.4%); *Kassover v. Huta,* No. 90–00848 (S.D.Cal., May, 1994) ($950,000 settlement fund)(46.1%).

### D. THE MOTION FOR CERTIFICATION OF A SUBCLASS

78. The burden to demonstrate the need for subclasses is on the party who is the proponent of creating the subclass. *In re Chambers Development Sec. Litig.*, 912 F.Supp. 822, 835 n. 9 (W.D.Pa.1995) (*citing United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 407–08, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980)). The creation of subclasses is left to the discretion of the district court and is appropriate only "when the court believes it will materially improve the litigation." *Id.* (quoting *Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of America*, 803 F.2d 878, 880 (6th Cir.1986)).

79. To justify the need for a subclass here, the Lazy Oil Objectors must satisfy the requirements of Rule 23 (numerosity, commonality, typicality and adequacy) and one of the categories under Fed.R.Civ.P. 23(b). *See* Fed.R.Civ.P. 23(c)(4)(B) ("When appropriate ... a class may be divided into subclasses and each subclass treated as a class, and the provisions of [Rule 23] shall then be construed and applied accordingly.").

80. The proposed subclass does not satisfy the typicality requirement of Rule 23(a) because claims for lost profits are inappropriate for class treatment. *See Franklin Container Corp. v. Int'l Paper Co.*, 1983–2 Trade Cas. (CCH) ¶ 65,727 at p. 69,722–23, 1982 WL 1958 at *3–4. Moreover, because each producer in the proposed subclass would be required to demonstrate lost profits and/or lost business on an individualized basis, the Lazy Oil Objectors' claims are not typical of the Class. *Id.*

81. In addition, the Lazy Oil Objectors' proposed subclass does not satisfy the requirement that the class representative fairly and adequately protect the interests of the subclass. Lost profits can only be demonstrated by showing the effect Defendants' actions had on each subclass member's business operations. *See Bogosian v. Gulf Oil Corp.*, 561 F.2d at 455 ("When plaintiff elects to prove damages on the basis of lost profits or going concern value, it would seem that his proof necessarily would focus on the operation of his business."); *Franklin* at ¶ 65,727 at p. 69,722., 1982 WL 1958 at *3–4. Because the market for Penn Grade crude is limited, and members of the proposed subclass are competitors, one member's ability to prove lost profits and/or business comes at the expense of another member's ability to do the same. *Franklin Container, supra*, at *3–4. *See also Yeager's Fuel v. Pa. Power & Light*, 162 F.R.D. 471, 478 (E.D.Pa.1995) (citing cases), *reconsideration denied*, 162 F.R.D. 482 (E.D.Pa.1995); *Christiana Mortg. Corp. v. Delaware Mortg. Bankers Ass'n*, 136 F.R.D. 372, 380 (D.Del.1991). This is particularly true in this case where transportation costs are a critical component of Defendants' demand for oil and Defendants are operating at full capacity. If a producer close to the Defendants' refineries drilled additional wells, Defendants would presumably substitute that closer (and therefore cheaper) oil for another producers' more distant (and therefore more expensive) oil. Thus, each member of the proposed class would be put in a direct conflict with every other member of the subclass. Due to this inherent conflict, the Lazy Oil Objectors could not (nor could any other producer) adequately represent the proposed subclass.

82. The Lazy Oil Objectors also fail to adequately define the proposed subclass. Failure to adequately define a proposed subclass creates problems with more than one of the prerequisites for class certification. The definition of the subclass is dependent on each producer's relationship with the royalty owner. Determining each producer's relationship would require extensive individual inquiries into individual contracts. Depending on the definition and contractual arrangement, certain "investors" may be able to assert lost profits and/or lost business claims. Moreover, the Lazy Oil Objectors proposed damage mod-

el appear to include claims for lost profits from non-drilling activity such as oil rig maintenance and repair. For those reasons, it is not readily apparent who qualifies for inclusion in the proposed subclass. Moreover, not all producers are necessarily direct sellers and therefore such indirect sellers would lack standing to bring claims.

83. Although courts have held that subclasses may be created in response to objections regarding the chosen form of relief, *see Safran v. United Steelworkers of America, AFL–CIO*, 132 F.R.D. 397, 404 (W.D.Pa.1989), the request in this case to create a subclass based on a new theory of recovery comes after all discovery has been completed, after expert reports have been submitted and after experts have been deposed. Although not technically a question of waiver or estoppel, at this point in the litigation, the introduction of new theories and new experts after the close of discovery would be a burden on the Court and the parties.

84. For the above stated reasons, creation of an independent producer subclass is not warranted.

## III. CONCLUSION

Having fully reviewed the record and having conducted a lengthy evidentiary hearing, the Court finds, for all of the foregoing reasons, that the proposed Settlement is fair, adequate, and reasonable. It will therefore be approved. Class Counsel's motion for an award of attorneys' fees and reimbursement of expenses will be granted to the extent set forth herein. Likewise, the Class Representatives' motion for an incentive award will be granted to the extent previously set forth herein. The Lazy Oil Objectors' motions to disqualify and/or remove Class Counsel will be denied with prejudice. The motion for certification of an independent producer subclass will similarly be denied with prejudice. Finally, because—based on this record—the Court continues to have reservations concerning the proposed Plan of Allocation, Plaintiffs' motion for approval

of the proposed Plan of Allocation will be denied without prejudice to be reasserted following further proceedings.

An appropriate order follows.

## ORDER

AND NOW, this 31st day of December, 1997, for the reasons stated in the accompanying Memorandum Opinion, IT IS HEREBY ORDERED as follows:

1. The Agreement of Settlement Between Plaintiff Class and Pennzoil Company, Pennzoil Products Company and Witco Corporation is APPROVED and the objections thereto OVERRULED;

2. The Plaintiffs' Motion [Doc. No. 223] for approval of the Proposed Plan of Allocation is DENIED without prejudice, pending further proceedings in this Court;

3. The Motion [Doc. No. 208] by Class Counsel for an Award of Attorneys' Fees and Reimbursement of Expenses is GRANTED to the extent set forth in the accompanying Memorandum Opinion;

4. The Motion [Doc. No. 187] by the Class Representatives for an Incentive Award is GRANTED to the extent set forth in the accompanying Memorandum Opinion;

5. The Motions for Removal [Doc. No. 182] and/or Disqualification [Doc. No. 264] of Class Counsel are DENIED with prejudice;

6. The Motion [Doc. No. 184] for Certification of Independent Producer Subclass is DENIED with prejudice; and

7. The Motion [Doc. No. 185] for Production of Pleadings, Briefs, Orders, Discovery and Attorney Work Product filed by Lazy Oil Co., John B. Andreassi and Thomas A. Miller Oil Co., is DENIED as moot.